T.C. Memo. 1998-157


UNITED STATES TAX COURT


MAUDE G. FURMAN, DONOR, DECEASED, AND ESTATE OF MAUDE G.
FURMAN, DECEASED, ROBERT G. FURMAN, EXECUTOR,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

ROYAL G. FURMAN, DONOR, DECEASED, AND ESTATE OF
ROYAL G. FURMAN, DECEASED, ROBERT G. FURMAN, EXECUTOR
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11568-96, 11569-96.      Filed April 30, 1998.


<u>Stanley W. Rosenkranz</u> and <u>James R. Freeman</u>, for petitioners.

<u>James F. Kearney</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal gift taxes and Federal estate tax and additions to tax as follows:

Estate of Maude G. Furman

|  | Deficiency | Additions to Tax | |
|  |  | Sec. 6651(a) | Sec. 6653(a) |
| --- | --- | --- | --- |
| Gift tax-- 1981 | $75,460 | $18,865 | $3,773 |
| Estate Tax | 115,649 | -- | -- |

Estate of Royal G. Furman

|  | Deficiency | Additions to Tax | |
|  |  | Sec. 6651(a) | Sec. 6653(a) |
| --- | --- | --- | --- |
| Gift tax-- 1981 | $75,460 | $18,865 | $3,773 |

After concessions regarding the estate tax deficiency, the issues for decision are:

1. Whether for purposes of computing the taxable gifts of Royal G. Furman (Royal) and the taxable gifts and taxable estate of Maude G. Furman (Maude), the fair market value of 24 shares of Furman's, Inc. (FIC) common stock exchanged by each of Royal and Maude in 1981 for preferred stock of FIC was $300,000 ($12,500 per share) as petitioners contend, $540,540 ($22,522 per share) as respondent contends, or some other amount. We hold that the fair market value was $424,552 ($17,690 per share).

2. Whether for purposes of computing Maude's taxable estate, the fair market value of six shares of FIC common stock that she transferred to Robert G. Furman (Robert) in 1980 was $62,016 ($10,336 per share), as petitioners contend, $147,600 ($24,600 per share), as respondent contends, or some other amount. We hold that the fair market value was $82,859 ($13,810 per share).

3.  Whether Royal and Maude had reasonable cause for failing to file gift tax returns for the period ending September 30, 1981, and whether their failures to pay gift taxes for that period were due to negligence or intentional disregard of rules and regulations.  We hold that Royal and Maude had reasonable cause for failing to file gift tax returns and were not negligent in failing to pay gift taxes.

## FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.  Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice & Procedure.  All amounts have been rounded to the nearest dollar.

A.  Decedents

Royal died testate on June 29, 1990.  His wife Maude died testate on June 12, 1992 (collectively decedents).  Royal and Maude were residents of Florida at the times of their deaths.  Robert, the personal representative of decedents' estates, resided in Florida at the time of filing the petitions.[1]  Decedents weresurvived by five children, including Robert, their son.

---

[1] Under Florida law, the terms "executor" and "personal representative" are synonymous.  Fla. Stat. Ann. sec. 731.201(25) (West 1995) defines "personal representative" as a court-appointed fiduciary who administers a decedent's estate.  For purposes of the Florida Probate Code, the definition supersedes "executor" and other synonymous terms.  Id.

B.    Furman's, Inc.

FIC is a Florida corporation that was organized in 1959. The principal place of business of FIC is Florida.  Throughout its existence FIC has been a C corporation, and the stock of FIC has never been publicly traded.  FIC was founded by Maude, Royal, and Robert for the purpose of acquiring and operating a Burger King[2] restaurant franchise after Royal had retired from a 35-year career as a mail carrier.  Until the founding of FIC, Maude, Royal, and Robert resided in Chicago, Illinois.

From its organization in 1959 until February 1980, FIC was capitalized with 100 shares of no-par common stock issued and outstanding, held as follows:

> Maude     30 shares
>
> Royal     30 shares
>
> Robert    40 shares

Although Royal and Maude had five children, Robert is their only child who has ever had a common stock ownership interest in FIC or been active in its management.

Burger King Corp. (BKC), a Florida corporation headquartered in Miami, Florida, is the franchisor of the second largest restaurant chain in the world, after McDonald's.  Since 1967, BKC has been a wholly owned subsidiary of Pillsbury, Inc.  Pillsbury was acquired by Grand Metropolitan PLC in 1989.

---

[2] Burger King Corp. is the exclusive licensee of the Burger King® registered trademark used in this opinion.

FIC, since its formation, has been engaged solely in the business of owning and operating franchised Burger King restaurants.  At the date of trial, FIC operated 27 Burger King restaurants, primarily in Manatee, Sarasota, Charlotte, and Lee Counties, on the west coast of Florida.

FIC entered the fast-food business in May 1959 by opening Burger King Store No. 12 (Store No. 12) in North Miami Beach, Florida, one of the original restaurants in the Burger King chain.  Royal and Maude relocated to Florida to operate the new restaurant, while Robert had intended to stay in Chicago, where he was employed as a special agent for an insurance company.

Just 2 weeks after the opening of Store No. 12, Robert received a call from James McLamore, one of the cofounders of BKC, informing him that Royal had been hospitalized.  Robert traveled to Florida and immediately went to work in Store No. 12. After Royal's recuperation, Robert decided to stay in Florida and help manage FIC.  Robert has remained in the fast-food business ever since.

In 1961, FIC purchased a 20-percent interest at a cost of $15,000 in three corporations that were opening Burger King restaurants in the greater Chicago area (the Chicago Operation). In 1962, at the request of Mr. McLamore, Robert moved back to Chicago to participate in the management and operation of the Chicago Operation of which he ultimately became executive vice president and a member of the board of directors.  Robert's

management duties in the Chicago Operation included the approval of new restaurant locations, supervising the construction of new restaurants, and the hiring and training of their employees. As of November 1969, the Chicago Operation directly operated 37 Burger King restaurants and was subfranchisor of 29 other Chicago-area Burger King restaurants.

In 1970, after a corporate reorganization of the Chicago Operation, FIC sold its interest in the Chicago Operation to Self-Service Restaurants (Self-Service), a publicly traded Burger King franchisee. In exchange for all of FIC's shares in the Chicago Operation, FIC received shares of Self-Service common stock that FIC later sold for approximately $222,000, as well as Self-Service's promissory note in the principal amount of $868,500. Following the sale, Robert was employed by Self-Service to assist during the period of transition to Self-Service management.

In 1971, Robert terminated his employment with Self-Service. Robert remained in Chicago, where he managed five Burger King restaurants that he owned directly, and participated in the management of six Burger King restaurants in Milwaukee, Wisconsin, in whose corporate franchisee he had acquired a 27-percent stock interest.

In 1973, FIC purchased an existing Burger King restaurant in Fort Myers, Florida. Thereafter, in 1976, after Robert returned to Florida, FIC acquired three existing Burger King restaurants,

in Sarasota, Bradenton, and Port Charlotte on the west coast of Florida (the 1976 Purchase), with an exclusive territorial agreement (the Territorial Agreement). The purchase price for the 1976 Purchase was $500,000, payable $300,000 in cash and $200,000 over 5 years. FIC allocated $200,000 of the $500,000 purchase price to the Territorial Agreement.

The Territorial Agreement granted FIC, for a period of 5 years, an exclusive territorial right to build, own, and operate Burger King restaurants in Manatee, Sarasota, and Charlotte Counties in Florida (the Exclusive Territories) and a right of first refusal to build, own, and operate Burger King restaurants in Lee County, Florida (collectively, the Protected Territories). The Territorial Agreement also provided that if FIC had six Burger King restaurants open and in operation on or before August 26, 1981, it would be entitled to a right of first refusal on all Burger King restaurants to be subsequently franchised in the Exclusive Territories through August 1986.

After his return to Florida, Robert moved to Sarasota, Florida, and worked full time for FIC selecting and developing real estate sites, securing financing, and supervising the construction of new restaurants, while continuing to supervise the operations of existing FIC-owned restaurants.

As of February 2, 1980, FIC had seven Burger King restaurants in operation in the Exclusive Territories. As of August 24, 1981, FIC had a total of nine Burger King restaurants.

Inasmuch as FIC had more than six Burger King restaurants in operation before August 26, 1981, FIC became entitled to the right of first refusal in the Exclusive Territories through August 1986.

C.    FIC's Advisers

    1.    Hugh B. Shillington

After opening Store No. 12 in 1959, FIC retained Hugh B. Shillington, C.P.A. (Mr. Shillington), as its outside accountant, to assist in tax and financial accounting matters.   Mr. Shillington was a principal of Shillington & Fay (S&F), a Coral Gables, Florida, accounting firm.   Mr. Shillington served as outside accountant to other Burger King franchisees and had been recommended to FIC by BKC.   S&F reviewed[3] FIC's annual financial statements, including financial statements for FIC's fiscal years ending September 30, 1979, 1980, and 1981 (FY 1979, FY 1980, and FY 1981).   Mr. Shillington, who advised FIC to retain its financial records for 7 years, died in 1995.

    2.    Louis B. Tishler, Jr.

Louis B. Tishler, Jr. (Mr. Tishler), is an attorney who has been practicing law in the Chicago area since his graduation from

---

[3] S&F annually reviewed the balance sheets, income statements, and statements of changes in financial position of FIC (the financial statements) in order to provide an opinion letter of limited assurance that S&F was aware of no material modifications that should be made to the financial statements in order for them to be in conformity with generally accepted accounting principles.  The scope of a review is substantially less than that of an audit.

Northwestern University School of Law in 1959.  Mr. Tishler's primary area of practice is franchising, in which he has been engaged since 1962.  Mr. Tishler has represented many well-known franchisors, including Dunkin' Donuts and McDonald's, among others.  Mr. Tishler has also represented numerous franchisees of Burger King and Church's Fried Chicken.  In the 1960's and 1970's, he represented Burger King franchisees in the acquisition of more than 100 restaurants.  Mr. Tishler began his representation of FIC in 1966 or 1967.  Both Messrs. Tishler and Shillington had assisted FIC in the making of its decision to allocate $200,000 of the purchase price of the 1976 Purchase to the Territorial Agreement.

D.  1980 Gift

By 1976, when the Territorial Agreement was executed, BKC had adopted a new policy requiring that corporate franchisees be operated by a shareholder with voting control of the corporation (the Control Requirement).  FIC did not then satisfy the Control Requirement, but Robert made an oral promise to BKC to acquire a controlling interest in FIC.  Despite Robert's promise, no such action was taken until 1980, when BKC demanded that Robert acquire voting control of FIC.  To satisfy BKC's demand, on February 2, 1980, decedents each transferred by gift 6 shares of FIC's common stock to Robert (the 1980 Gifts).  By the time of the 1980 Gifts, neither of decedents was actively participating in the day-to-day management or operations of FIC.

As of September 30, 1979, the book value of FIC's common stock was $1,033,601. As of February 2, 1980, no dividends had ever been declared or paid on FIC's common stock. With the assistance of Robert, Mr. Shillington, and Mr. Tishler, decedents valued their respective gifts of 6 shares of FIC stock at $62,016 ($10,336 per share) and timely filed the requisite gift tax returns reporting the 1980 Gifts. The period of limitations on assessment of additional gift tax on the 1980 Gifts has expired.

Following the 1980 Gifts, the outstanding common stock of FIC was owned as follows:

|  |  |
|---|---|
| Royal | 24 shares |
| Maude | 24 shares |
| Robert | 52 shares |

Following the 1980 Gifts, decedents executed codicils to their wills providing that their remaining shares of FIC's common stock would be distributed equally among all their children, to the exclusion of Robert.

E. 1981 Recapitalization

In 1980 or 1981, BKC requested that all shareholders of FIC personally guarantee the debt of FIC to BKC. Neither decedent was willing to accede to BKC's request, while Robert was willing to become liable as the sole guarantor only if decedents agreed to relinquish their voting rights in FIC. Robert's reluctance to be the sole guarantor emanated, in part, from the terms of decedents' wills, under which Robert's siblings would eventually

own all decedents' remaining shares in FIC, while Robert would be left the sole guarantor of FIC's debt.  Decedents, who were then over 70 years of age, acknowledged their diminished participation in FIC's affairs and Robert's leading role and agreed to relinquish their voting rights only under the following conditions:  (i) Robert would continue to actively direct FIC; (ii) FIC would be kept intact; (iii) decedents would receive a fixed income from their investment in FIC; (iv) decedents would be released from any obligation to guarantee FIC's debt; and (v) decedents would receive some kind of equity interest that they could pass on to their children other than Robert.

In order to provide Robert with all the voting stock of FIC and satisfy decedents' conditions, Robert and decedents agreed to a recapitalization of FIC whereby decedents would exchange their common stock for preferred stock.  Before the recapitalization, with the assistance of Mr. Tishler, FIC requested and received a private letter ruling from the Internal Revenue Service that the proposed exchange of common stock for preferred stock would qualify as a reorganization for income tax purposes within the meaning of section 368(a)(1)(E).

On August 24, 1981, FIC's articles of incorporation were amended to authorize 5,000 shares of no-par voting common stock and 6,000 shares of par value $100, nonvoting, 10-percent cumulative preferred stock (the Preferred Stock).  The Preferred Stock contained no participation, conversion or redemption rights.  On August 24, 1981, each of decedents exchanged 24

shares of common stock for 3,000 shares of Preferred Stock (the Recapitalization).

While the Recapitalization indirectly addressed BKC's requirement that each common shareholder personally guarantee the debt of FIC, the Recapitalization had not been required by any condition imposed by BKC.

As of September 30, 1981, the book value of FIC's common stock was $1,109,400.  Decedents did not file any 1981 gift tax returns reporting any donative transfers that they may have made by reason of their participation in the Recapitalization.

After the Recapitalization, decedents executed new wills devising their shares of Preferred Stock to their children other than Robert.[4]  As of the date of trial, all the Preferred Stock has remained outstanding, all dividends on the Preferred Stock have been timely declared and paid, and Robert has been the only shareholder to personally guarantee the debts of FIC.

F.   Estate Tax Returns

Royal died on June 29, 1990, and Maude died on June 12, 1992.  Robert, as personal representative, executed and timely filed the required estate tax returns.  The adjusted taxable gifts reported on line 4 of the estate tax returns for Royal's

---

[4] In a distinction dating from the 19th century, a testator devises real property to a devisee and bequeaths personal property to a legatee.  Dukeminier, Wills, Trusts, and Estates 36 (1984).  However, the Florida Probate Code uses the term "devise" to describe the transfer at death of personal property as well as real property.  Fla. Stat. Ann. sec. 731.201(8) (West 1995).

and Maude's estates reflected the 1980 Gifts as reported by Royal and Maude on their respective 1980 gift tax returns. The period of limitations on assessment of additional estate tax against Royal's estate has expired.

G.    Notices of Deficiency

On March 11, 1996, respondent issued three deficiency notices: (i) For gift tax for the period ending September 30, 1981, to Maude G. Furman, donor, deceased, Estate of Maude G. Furman, deceased, and Robert G. Furman, Executor (the Maude Gift Tax Notice); (ii) for estate tax to the Estate of Maude G. Furman, deceased, and Robert G. Furman, Executor (the Estate Tax Notice); and (iii) for gift tax for the period ending September 30, 1981, to Royal G. Furman, donor, deceased, Estate of Royal G. Furman, deceased, Robert G. Furman, Executor (the Royal Gift Tax Notice).

The Estate Tax Notice determined that the fair market value of the shares transferred by each decedent in the 1980 Gifts was $147,600 ($24,600 per share), rather than the $62,016 ($10,366 per share) that they had reported on their 1980 gift tax returns. Both the Maude Gift Tax Notice and Royal Gift Tax Notice determined that the fair market value of the 24 shares of FIC common stock exchanged by each decedent in the Recapitalization was $540,540 ($22,522 per share), while the 3,000 shares of preferred stock received by each decedent in the Recapitalization

had a fair market value of only $300,000 ($100 per share),[5]

resulting in gifts by each of them to Robert of $240,540, before

allowance for the $3,000 annual exclusion.[6]

After concessions by Maude's estate, the remaining items at

issue in the Estate Tax Notice are respondent's determinations

that for purposes of the estate tax:  (i) The fair market value

on February 2, 1980, of the donative transfer of 6 shares of

FIC's common stock from Maude to Robert was $147,600, rather than

---

[5] Respondent has not contested that the preferred shares of
FIC had a fair market value equal to their par value when
received by decedents.  Valued at par, FIC's preferred shares,
with no participatory or residual rights beyond the stated
dividend and par value, would yield 10 percent if dividends were
declared and paid in a timely fashion by the directors elected by
the holder(s) of the common stock of this small, closely held
corporation.  Inasmuch as the parties have stipulated that
returns on a 20-year Treasury bond (risk-free rate) in 1980 and
1981 were 11.86 percent and 14.4 percent, respectively,
respondent's acceptance of par as the value of the preferred
shares appears to be highly questionable.  In addition, the
closely held character of FIC, the nonvoting characteristics of
the preferred, and the resulting inability of the preferred
holders to compel the payment of dividends or bring about
redemption of their preferred shares or liquidation of the
company would have justified substantial minority and lack-of-
marketability discounts for the preferred.  Despite our
misgivings, we decline to revalue the preferred shares on our own
motion.

[6] See sec. 2503(b).  The Economic Recovery Tax Act of 1981,
Pub. L. 97-34, sec. 441(a), 95 Stat. 319, which does not apply in
this case, amended sec. 2503(b) by increasing the annual
exclusion to $10,000, for transfers made after Dec. 31, 1981.

Respondent determined that Royal and Maude had made gifts of
$240,540 before allowance for the $3,000 annual exclusion.  Royal
was determined to have made a taxable gift of $237,540, while
Maude was determined to have made a taxable gift of $237,840.
This discrepancy appears to be the result of a computational
error by respondent.

the $62,016 reported, so that for purposes of computing the tentative estate tax, an additional $85,584 in adjusted taxable gifts should have been added to the taxable estate;[7] and (ii) on August 24, 1981, when Maude exchanged her 24 shares of FIC's common stock for 3,000 shares of FIC's preferred stock, the fair market value of the common stock was $540,540 ($22,522 per share) and the fair market value of the preferred stock, $300,000 ($100,000 per share). Consequently, the Estate Tax Notice determined that there was a taxable gift in the amount of $237,540 ($240,540 less $3,000 annual exclusion), thereby increasing the adjusted taxable gifts that are added to the reported taxable estate for purposes of computing the tentative estate tax.

## H. Discounts and Premiums

### 1. Minority Interests

On both February 2, 1980, and August 24, 1981, each decedent was a minority shareholder.

Neither decedent had the power to compel FIC to purchase key person insurance.

### 2. Absence of Swing Vote

On February 2, 1980, no FIC shareholder could obtain voting

---

[7] Any increase found in the fair market value of the 1980 Gifts will trigger an increase in taxable gifts of like amount, because decedents' 1980 gift tax return has already taken into account the annual exclusion provided by sec. 2503(b). Decedents reported additional taxable gifts to Robert on their respective gift tax returns for the first quarter of 1980 that are not at issue in this case.

control of FIC through the receipt of 6 shares of issued and outstanding FIC common stock.  On February 2, 1980, no shareholder of FIC other than Robert could obtain voting control of FIC through the receipt of 12 shares of issued and outstanding FIC common stock.  Because only one person, Robert, could gain control through the 1980 Gifts, no swing vote premium would have been paid by a hypothetical third-party buyer of shares of FIC owned by Maude and Royal.

On August 24, 1981, voting control of FIC could not be affected by the transfer of Maude and Royal's respective holdings of FIC common stock, singularly or collectively.

3.   Lack of Marketability

On both February 2, 1980, and August 24, 1981:  (1) BKC had not established a buy-back program or policy for acquiring Burger King franchises; (2) high interest rates contributed to a depressed market for the sale of Burger King franchises; and (3) there was no readily available market for the stock of FIC. Each of the foregoing factors contributed to a lack of marketability of FIC stock.

4.   Combined Minority and Lack of Marketability Discount

On February 2, 1980, the fair market value of each decedent's gratuitous transfer of 6 shares of FIC's common stock was subject to a combined minority and marketability discount of 40 percent.  On August 24, 1981, the fair market value of the 24 shares of FIC's common stock transferred by each decedent in the

Recapitalization was subject to a combined minority and marketability discount of 40 percent.

    5.    <u>Robert Furman a Key Person</u>

At the times of the 1980 Gifts and the Recapitalization, Robert actively managed FIC, and no succession plan was in effect.  FIC employed no individual who was qualified to succeed Robert in the management of FIC.  Robert's active participation, experience, business contacts,[8] and reputation as a Burger King franchisee contributed to the value of FIC.  Specifically, it was Robert whose contacts had made possible the 1976 Purchase, and whose expertise in selecting sites for new restaurants and supervising their construction and startup were of critical importance in enabling FIC to avail itself of the expansion opportunities created by the Territorial Agreement.  The possibility of Robert's untimely death, disability, or resignation contributed to uncertainty in the value of FIC's operations and future cash-flows.  Although a professional manager could have been hired to replace Robert, the following risks would still have been present:  (i) Lack of management until a replacement was hired; (ii) the risk that a professional manager would require higher compensation than Robert had received; and (iii) the risk that a professional manager would not perform as well as Robert.

---

[8] Robert developed close friendships with the cofounders of BKC, especially James McLamore, along with Art Rosewall, BKC's chief executive officer.

Robert was a key person in the management of FIC. His potential absence or inability were risks that had a negative impact on the fair market value of FIC. On February 2, 1980, the fair market value of each decedent's gratuitous transfer of 6 shares of FIC's common stock was subject to a key-person discount of 10 percent. On August 24, 1981, the fair market value of the 24 shares of FIC's common stock transferred by each decedent in the Recapitalization was subject to a key-person discount of 10 percent.

## ULTIMATE FINDINGS OF FACT

On February 2, 1980, the fair market value of the gratuitous transfer of 6 shares of FIC's common stock by each of Maude and Royal to Robert was $82,859 ($13,810 per share).

On August 24, 1981, when Maude and Royal each exchanged 24 shares of FIC common stock for 3,000 shares of FIC's preferred stock, the fair market value of the common stock transferred by each of them was $424,552 ($17,690 per share).

## OPINION

A. Fair Market Value of FIC Stock

Section 2501(a) provides for a tax on gifts by individuals. Section 2512(a) provides that the value of a gift of property at the date of the gift shall be considered the amount of the gift.

The principal issues we must decide in this case are the value of the shares of common stock in FIC that decedents gratuitously transferred to Robert on February 2, 1980, and the

amount, if any, of the excess of the value of the shares of common stock that decedents surrendered in the Recapitalization of August 24, 1981, over the value of the shares of preferred stock that they received in the exchange. The amount of any such excess, by augmenting the value of Robert's common stock in FIC, would be a taxable gift from decedents to Robert. See Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121 supplemented by T.C. Memo. 1995-232; sec. 25.2511-1(h)(1), Gift Tax Regs.

Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Skripak v. Commissioner, 84 T.C. 285, 320 (1985).

Fair market value is defined for Federal estate and gift tax purposes as the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all the relevant facts and neither being under compulsion to buy or to sell. United States v. Cartwright, 411 U.S. 546, 551 (1973) (citing sec. 20.2031-1(b), Estate Tax Regs.); see also Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). The willing buyer and the willing seller are hypothetical persons, rather than specific

individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer. Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, supra at 218; see also Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595. The hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage. Estate of Curry v. United States, supra at 1428; Estate of Newhouse v. Commissioner, supra at 218. This advantage must be achieved in the context of market and economic conditions at the valuation date. Estate of Newhouse v. Commissioner, supra at 218.

For Federal gift tax purposes, the fair market value of the subject property is determined as of the date of the gift; ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the subject property on some later date. Sec. 2512(a); sec. 20.2031-1(b), Estate Tax Regs.; see also First Natl. Bank v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Newhouse v. Commissioner, supra at 218; Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987).

Special rules apply to the valuation of the stock of a

closely held corporation. While listed market prices are the benchmark in the case of publicly traded stock, recent arm's-length transactions generally are the best evidence of fair market value in the case of unlisted stock. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979). Where the value of unlisted stock cannot be determined from actual sale prices, value is determined by taking into consideration the value of listed stock in comparable corporations engaged in the same or a similar line of business, as well as all other factors bearing on value, including analysis of fundamentals. Sec. 2031(b); Estate of Newhouse v. Commissioner, supra at 217; Estate of Hall v. Commissioner, supra at 336. The factors that we must consider are those that an informed buyer and an informed seller would take into account. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. Rev. Rul. 59-60, 1959-1 C.B. 237, "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value", Estate of Newhouse v. Commissioner, supra at 217; it lists the following factors to be considered, which are virtually identical to those listed in section 20.2031-2(f), Estate Tax Regs.:

> (a) The nature of the business and the history of the enterprise from its inception.
> (b) The economic outlook in general and the condition and outlook of the specific industry in particular.
> (c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.
(e) The dividend-paying capacity.
(f) Whether or not the enterprise has goodwill or other intangible value.
(g) Sales of the stock and the size of the block of stock to be valued.
(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. [Rev. Rul. 59-60, 1959-1 C.B. at 238-239.]

Because valuation may not be reduced to the rote application of formulas, and because of the imprecision inherent in determining fair market value of stock that lacks a public market (and the Solomon-like pronouncements that often follow), we again remind the parties that these matters are better resolved by agreement rather than trial by ordeal in which conflicting opinions of the experts are pitted against each other.  See Estate of Hall v. Commissioner, supra; Messing v. Commissioner, 48 T.C. 502, 512 (1967); see also Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441 (1980).

As is customary in valuation cases, the parties rely primarily on expert opinion evidence to support their contrary valuation positions.  We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record.  Anderson v. Commissioner, supra; Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We have broad discretion to evaluate "`the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200),

affg. in part and revg. in part T.C. Memo. 1986-318. Expert testimony sometimes aids the Court in determining values and sometimes it does not. See, e.g., Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989) (expert testimony is not useful when the expert is merely an advocate for the position argued by one of the parties). We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment. Helvering v. National Grocery Co., supra at 295; Anderson v. Commissioner, 250 F.2d at 249; Estate of Newhouse v. Commissioner, 94 T.C. at 217; Estate of Hall v. Commissioner, 92 T.C. at 338. Where necessary, we may reach a determination of value based on our own examination of the evidence in the record. Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285); Ames v. Commissioner, T.C. Memo. 1990-87. Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). We have broad discretion in selecting valuation methods. Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", Colonial

Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated January 22, 1951. Moreover, while we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra at 452, we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, Parker v. Commissioner, supra at 561. Finally, because valuation necessarily results in an approximation, the figure at which this Court arrives need not be one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence. Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

1. Respondent's Expert

Respondent relies on the expert report of Hugh Jackson Shelton (Mr. Shelton). Mr. Shelton has been employed by respondent as a valuation engineer since 1987, in which time he has completed approximately 10 business valuations. Mr. Shelton holds a bachelor of science degree in industrial engineering from the University of Tennessee and a master of arts degree in business management from Webster University.

In the expert report submitted by respondent, Mr. Shelton represents that he has certain qualifications and credentials to perform business valuations that he does not in fact have, including courses on valuation that he has not successfully completed. Mr. Shelton's report also suggests that he is a

member of the American Society of Appraisers, to which he has never belonged. Since Mr. Shelton has not demonstrated that he is qualified to perform a business valuation, we will evaluate his opinion accordingly. See Anderson v. Commissioner, supra at 249.

Mr. Shelton used a capitalized earnings method to value the FIC stock at the time of the 1980 Gifts. Using the capital asset pricing model (CAPM), Mr. Shelton calculated a cost of equity and then computed FIC's weighted average cost of capital (WACC). Earnings before interest, depreciation, and taxes (EBIDT), a variant of EBITDA (earnings before interest, taxes, depreciation, and amortization), were then capitalized using the WACC to arrive at a total enterprise value. In valuing the 1980 Gifts, Mr. Shelton projected 12-month earnings from FIC's 10-month income statement for FY 1979, which he then capitalized to arrive at a February 1980 enterprise value. Mr. Shelton determined August 1981 enterprise value by capitalizing FY 1980 EBIDT and then adding 5 percent to reflect FIC's value in August 1981.

After determining that FIC had a beta of 1.0., Mr. Shelton used the standard CAPM formula to arrive at a cost of equity of 18.44 percent. See description and discussion of beta infra pp. 28-30. Finding that Burger King was the number two fast food chain, Mr. Shelton reasoned that Burger King would be no more or less volatile than the fast food industry as a whole, justifying a beta of 1.0 for FIC's common stock. In his report, Mr. Shelton

gave no further explanation of his choice of beta and did not provide evidence that he had investigated the betas of comparable public companies, or even of BKC, on which his selection of beta was based.[9]

After determining a cost of equity using CAPM, Mr. Shelton purported to compute the WACC of FIC in order to arrive at a capitalization rate. Without providing any explanation, Mr. Shelton computed WACC in a manner that did not conform to the accepted method. See Brealey & Myers, Principles of Corporate Finance 465-469 (4th ed. 1991); Pratt et al., Valuing a Business 180, 184, 189-190 (3d ed. 1996). First, Mr. Shelton modified the WACC formula by weighting FIC's debt and equity based on book value, rather than market value, to arrive at a WACC of 11.0 percent. Considering that the parties have stipulated risk-free rates of 11.86 percent and 14.4 percent in 1980 and 1981, respectively, it is obvious that Mr. Shelton's result is incorrect.

The calculation of WACC provides an after-tax figure, because it is computed using an estimate of the firm's marginal corporate income tax rate. After finding that FIC had a WACC of 11.0 percent, Mr. Shelton tried to convert WACC to a pretax figure. Mr. Shelton calculated what he referred to as a pretax

---

[9] At the time of the Recapitalization, as discussed supra, BKC was a wholly owned subsidiary of Pillsbury. Because BKC stock did not trade publicly, it did not have a beta. See discussion and explanation of beta, infra pp. 28-30.

WACC of 18.4 percent, which he then used to value FIC.  Not only is the calculation of pretax WACC not accepted in the financial community; we are puzzled as to why Mr. Shelton would want to apply a marginal tax rate to compute an after-tax figure, only to then attempt to convert it back to a pretax figure.  Finally, we question Mr. Shelton's use of a 40-percent marginal tax rate in computing WACC, when the marginal tax rates derived from FIC's income statements for FY 1979, FY 1980, and FY 1981 are 4.96 percent, 1.25 percent, and 31.69 percent, respectively.

After capitalizing the FY 1979 and FY 1980 EBIDT's of FIC, Mr. Shelton arrived at total enterprise values of $2,764,114, $3,481,369, and $3,655,427 on February 2, 1980, September 30, 1980, and August 24, 1981, respectively.  Mr. Shelton then discounted the 1980 and 1981 enterprise values by 17 percent to reflect a combined minority, lack of marketability, and "control premium discount [sic]", to arrive at a fair market value of $22,942 per share as of February 1980 and $30,340 as of August 1981.  Applying the annual exclusion to the 1981 gifts only, acceptance of respondent's position would result in taxable gifts by each decedent of $137,652 and $425,160 in 1980 and 1981, respectively.  Understatements of taxable gifts by each decedent would then amount to $75,636 and $425,160 for 1980 and 1981, respectively.

With the exception of his assessment of the prospects for economic growth on the west coast of Florida, we reject, in toto,

Mr. Shelton's analysis and conclusions.  Although we do not rely on any aspect of Mr. Shelton's opinion, we will discuss some of the major shortcomings for the sake of completeness.

We do not believe that CAPM and WACC are the proper analytical tools to value a small, closely held corporation with little possibility of going public.  CAPM is a financial model intended to explain the behavior of publicly traded securities that has been subjected to empirical validation using only historical data of the two largest U.S. stock markets.  Raabe & Whittenburg, "Is the Capital Asset Pricing Model Appropriate in Tax Litigation?", Valuation Strategies 12-15, 36 (Jan./Feb. 1998); see Brealey & Myers, supra at 166 (citing Fama & MacBeth, "Risk, Return and Equilibrium: Empirical Tests," 81 Journal of Political Economy 607-636 (1973)).  Contrary to the assumptions of CAPM, the market for stock in a closely held corporation like FIC is not efficient, is subject to substantial transaction costs, and does not offer liquidity.  Mr. Shelton did not increase our confidence in his choice of method when he computed the cost of equity using an unsubstantiated risk-free rate and risk premium that were not in conformance with the amounts stipulated, and when he arbitrarily assigned a beta to FIC's common stock.  Beta, a measure of systematic risk,[10] is a

_____

[10] For purposes of capital market theory, risk is defined as the degree of uncertainty that expected future returns will be realized.  Capital market theory divides risk into two components:  Systematic risk and unsystematic risk.  Systematic,
                                                    (continued...)

function of the relationship between the return on an individual security and the return on the market as a whole. Pratt et al., supra at 166. Betas of public companies are frequently published, or can be calculated based on price and earnings data. Because the calculation of beta requires historical pricing data, beta can not be calculated for stock in a closely held corporation. The inability to calculate beta is a significant shortcoming in the use of CAPM to value a closely held corporation; this shortcoming is most accurately resolved by using the betas of comparable public companies. Id. at 175. Mr. Shelton's unsubstantiated statement regarding the standing of BKC in the fast food industry is hardly a sufficient basis for arriving at a beta of 1.0 for FIC. Mr. Shelton did not provide any evidence that he had researched or calculated the betas of BKC or any other public company. He seems to have assumed, without further explanation, that FIC and BKC were comparable

_____

[10](...continued)
or market, risk represents the sensitivity of the future returns from a given asset to the movements of the market as a whole. Unsystematic, or unique, risk reflects those elements of risk that are specific to the asset held, such as company characteristics, industry conditions, and the type of investment interest held. Capital market theory assumes that investors hold or have the ability to hold, diversified portfolios that eliminate, on a portfolio basis, the effects of unsystematic risk. Consequently, since capital market theory assumes that an investor holding a diversified portfolio will encounter only systematic risk, the only type of risk for which an investor can be compensated, is systematic risk, the degree of which can be measured by beta. Brealey & Myers, Principles of Corporate Finance 137-138, 143-144 (4th ed. 1991); Pratt et al., Valuing a Business 166 (3d ed. 1996).

companies for this purpose.  Finally, we reject Mr. Shelton's methodology for estimating FIC's beta, since it was based on BKC's industry standing and not on references to the volatility of stock in FIC in comparison to the market as a whole.[11]  See Brealey & Myers, supra at G2 (defining beta as a "measure of market risk").

Mr. Shelton's use and application of the WACC fares no better under our scrutiny.  WACC is generally used to calculate a discount rate that reflects the weighted average cost of each of the components of a firm's capital structure.  To compute WACC, it is necessary to know the market value of the firm's debt and equity, which if known, would go far toward negating the need to perform a valuation.  In computing WACC, Mr. Shelton used FIC's book value weighting of debt and equity, rather than market value, without justifying his departure.

We also find fault with Mr. Shelton's computation of EBIDT and the manner in which he arrives at an enterprise value as of August 24, 1981.  Since the parties have stipulated the proper EBIDTA amounts for the periods in question, we abstain from further comment on Mr. Shelton's computation of EBIDT.  We do,

_____

[11] Mr. Shelton's conception of beta as a measure of the relative volatility of a specific security in comparison to an industry should not be confused with industry beta, which is often used to calculate discount or capitalization rates. Industry beta is calculated from the individual betas of a portfolio of securities within the same industry and reflects the market risk of that industry portfolio.  See Brealey & Myers, supra at 189.  Unlike Mr. Shelton's method, industry beta focuses on market risk.

however, question Mr. Shelton's failure to incorporate the reported FY 1981 earnings of FIC into his August 24, 1981, valuation; his estimate of 5-percent growth could hardly be viewed as reasonable where actual EBIDTA growth for FY 1981 was 61 percent.[12] We also fault Mr. Shelton's failure to deduct the outstanding debt of FIC from his capitalization of EBIDT in determining FIC's enterprise value.

Mr. Shelton's report also contains detailed calculations from which he attempts to determine the replacement cost of building 10 Burger King restaurants. We are unsure what relevance such a calculation has to the valuation of a business where value is determined by the prospect of future earnings rather than net asset value. Moreover, Mr. Shelton's use of 1992 data in computing replacement cost is of no relevance to the valuation of stock in 1980 and 1981.

Our final criticism of Mr. Shelton's report has little if any bearing on his valuation conclusion but has again caused us to doubt his expertise. In his report, Mr. Shelton attempted to analyze the FY 1979 and FY 1980 balance sheets of FIC. Using the FY 1979 balance sheet data of FIC, Mr. Shelton "projected" a 12-month balance sheet for 1979 by substantially increasing the amounts of some of the balance sheet items, without indicating what items on the income statement would lead to such growth in the amounts reported on the projected balance sheet.

---

[12] Employing a larger growth factor would have led to a higher valuation.

2.    Petitioners' Expert

Petitioners rely on the expert report of Francis X. Burns (Mr. Burns) and Brian R. Oliver (Mr. Oliver) of IPC Group, LLC (IPC).  Messrs. Burns and Oliver are both experienced in business valuation and, in addition to their undergraduate degrees, hold master's degrees in finance from Northwestern University's Kellogg School of Management.  Although Messrs. Burns and Oliver are not formally accredited as appraisers, we are satisfied that they are qualified to perform a business valuation.  Fed. R. Evid. 702; see Martin Ice Cream Co. v. Commissioner, 110 T.C. ___, ___ (1998) (slip op. at 52).

IPC valued the FIC shares using two approaches:  A capitalized income method (income method) and a multiple of EBITDA method (EBITDA multiple method).

Applying the income method, IPC determined per-share values for the stock transferred in the 1980 Gifts and the 1981 Recapitalization of $7,388 and $4,273, respectively.  Value was determined under the income method by capitalizing a measure of normalized earnings, adding the fair market value of nonoperating assets, and then applying a marketability discount to the per-share value.  IPC determined normalized earnings using net operating cash-flow available to equity holders (NCF), adjusted to reflect noncash charges.  In valuing the 1980 Gifts, IPC used the NCF for FY 1979, a 10-month fiscal year.  A weighted average of the net operating cash-flows for the previous 3 years was used

to compute the August 1981 fair market value of the stock.

IPC applied CAPM principles to determine the rate of return an investor would expect in February 1980 and August 1981. IPC used market data from Ibbotson Associates[13] and determined that the expected rate of return an investor in FIC stock would demand would be equal to the sum of the applicable risk-free rate, risk premium, and small-stock premium, as well as an additional premium to account for the risk specific to FIC. To reflect the effect of nominal long-term earnings growth, IPC subtracted a growth factor[14] from the expected rate of return and determined a capitalization rate of 21.38 percent for valuing the 1980 Gifts and a 25.50 percent capitalization rate for valuing the stock transferred in the Recapitalization.

After capitalizing normalized earnings to determine enterprise value from operations, IPC added the market value of FIC's nonoperating assets to determine total equity value. IPC computed a per-share equity value of $11,366 for the 1980 Gifts

[13] The parties stipulated that the Ibbotson Associates figures used by IPC were correct for the dates in question. They have not stipulated: (1) The proper capitalization rate; (2) the correctness of any FIC specific risk premium; or (3) the correctness of any particular method of computing a capitalization rate.

[14] IPC determined growth factors of 8 percent for the 1980 Gifts and 7 percent for the Recapitalization, on the basis of the long-term inflation outlook of the Value Line Investment Survey on Feb. 1, 1980, and Aug. 21, 1981. Apparently, IPC did not take into account the likelihood of real earnings growth attributable to FIC's ability to open more restaurants in its expanding market, as well as the likelihood of increasing sales in the existing restaurants.

and $6,574 per share for the Recapitalization.  IPC then determined that a marketability discount of 35 percent should be applied because of the following factors:  (1) The transactions at issue involved minority interests, which are harder to sell; (2) the size of FIC precluded the possibility of a public offering; and (3), as of the relevant dates, no dividends had ever been paid by FIC on its common stock.  After applying the marketability discount, IPC determined that the fair market value of the stock, per share, was $7,388 in 1980 and $4,273 in 1981. In comparison, book value per share after applying a 30-percent minority interest discount and a 35-percent marketability discount was determined to be $4,703 in 1980 and $5,048 in 1981. Applying book value as a floor in the valuation, IPC determined that use of the income method resulted in an undervaluation.

Petitioners have relied upon IPC's second method of valuation, the EBITDA multiple method.  Under this method, a multiple of net earnings before interest, taxes, depreciation, and amortization (EBITDA) was used to determine total enterprise value.  IPC determined the EBITDA of FIC for the FY 1979 through FY 1981.  In valuing the 1980 Gifts, IPC used a multiple of FY 1979 EBITDA; a multiple of the weighted average of EBITDA for FY 1979 through FY 1981 was used to value the stock transferred in the Recapitalization.  The parties have stipulated FIC's EBITDA for FY 1979 through FY 1981, using the figures determined by IPC.

IPC determined that a multiple of 4 to 6 times EBITDA was a

commonly used valuation guideline that should be applied in this case. IPC determined that high interest rates, a sluggish economy, and the high returns required by investors in small companies were factors that would depress the value of FIC stock, leading to a multiple in the order of 4.0 to 4.5, while the modestly successful sales growth of FIC between 1979 and 1981 suggested a multiple of 5.0 to 5.5. IPC concluded that FIC should be valued using an EBITDA multiple of 5.0 for both 1980 and 1981.

After determining total enterprise value, IPC made various adjustments, such as subtracting the value of outstanding debt, to determine total equity value, which was then converted to equity value per share. Equity value per share was determined to be $20,842 in February 1980 and $26,245 in August 1981. After applying a 30-percent minority discount, a 35-percent marketability discount, and a 10-percent key-person discount, or a total of 59.05 percent in discounts, IPC determined a fair market value per share of $8,535 in February 1980 and $10,747 in August 1981; following these conclusions would result in an overstatement of $10,806 for Royal and Maude's 1980 taxable gifts, and zero taxable gifts for their transfers in 1981.

We found Messrs. Burns and Oliver to be qualified, experienced, and credible expert witnesses. We agree with them that valuing FIC using the income method would not be appropriate inasmuch as the income method produces a value less than book

value for August 1981.  While it is odd that the use of an

accepted method like this one would produce a value lower than

book value, this oddity is explained by IPC's incorrect

computation of book value for August 1981,[15] and, we suspect, an

overstated capitalization rate.

Our major criticism of IPC's application of the income

method was their construction of the capitalization rate.  In

deducting a long-term growth factor from the expected rate of

return, IPC deducted 8 percent for the 1980 capitalization rate

and 7 percent for the 1981 rate.  Since these figures are

identical to the inflation estimates of the Value Line Investment

Survey that were cited by IPC in its report, the growth factors

used represented only the expectation of nominal earnings growth:

the growth in earnings caused by price inflation.  FIC was a

growing business; real sales and earnings growth could be

expected, both from increased volume at existing restaurants and

from the construction of new stores in the Exclusive Territory,

---

[15] IPC calculated discounted book value for August 1981
using the FY 1981 balance sheet.  Discounted book value of the
common stock was calculated as total stockholders' equity, less
$600,000 to reflect the preferred stock issued in the
Recapitalization, and then minority and marketability discounts
were applied.  Because the relevant valuation period is
immediately before the Recapitalization, at which time only one
class of stock existed, it was improper to use the unadjusted FY
1981 balance sheet figures reflecting the capital structure of
FIC after it had been recapitalized.  Discounted book value
should have been computed as total stockholder's equity, subject
to the minority and marketability discounts, which would have
produced a discounted book value per share of $7,778 per share,
rather than the $5,048 per share determined by IPC.

which was an area of rapid population growth.

We accept IPC's valuation under the EBITDA multiple approach as the most accurate measurement of value available, but we do not accept the percentages of minority interest and marketability discounts that were applied. We also reject IPC's use of a multiple rate of 5.0 as unreasonable in light of FIC's growth potential and the prevailing economic conditions.

At time of the Recapitalization, FIC had only nine Burger King restaurants open but held a right of first refusal that provided FIC with a protected territory in four southwest Florida counties that were experiencing rapid population growth. Because many of the FIC restaurants were new at the time of the Recapitalization, we think that a prospective purchaser of stock in FIC would expect earnings from existing restaurants to increase as an area presence was established and store sales were increased; the fact that FIC had the ability to block potential Burger King franchisees from entering its market would only strengthen such an expectation. Since the exercise of the right of first refusal would enable FIC to open additional restaurants in the Protected Territories, we think that a prospective purchaser would be bullish regarding FIC's potential for earnings growth from expansion.

Because we think that IPC has not properly taken into account FIC's potential for growth, we find 6.0 times EBITDA to be the proper multiple to be employed in the valuation of the FIC

stock.  We approve petitioners' weighting of EBITDA in determining an August 1981 value, since we believe that the use of 3 years of financial statements provided a more accurate earnings picture than the capitalization of any single year.[16] Finally, we approve of the adjustments made by IPC after calculating a multiple of EBITDA.  We find that the stock in FIC had an equity value per share of $25,574 in February 1980 and $32,759 in August 1981.

### 3.  Discounts

#### a.  Minority Interest Discount

A minority interest discount reflects the minority shareholder's inability to compel either the payment of dividends or liquidation in order to realize a pro rata share of the corporation's net earnings or net asset value.  Discounts for a minority interest and for lack of marketability are conceptually distinct, and the appropriate percentage rate of each of them is a question of fact.  Estate of Newhouse v. Commissioner, 94 T.C. at 249.

Because the blocks of stock transferred in the 1980 Gifts and in the 1981 Recapitalization were minority interests, it is appropriate to apply a minority interest discount in their valuation.  Since the willing buyer-willing seller test is an objective test, requiring that potential transactions be analyzed

---

[16] FY 1979, FY 1980, and FY 1981 EBITDA were weighted 10 percent, 30 percent, and 60 percent, respectively.

from the viewpoint of a hypothetical seller, whether a block of stock is a minority interest must be determined without regard to the identity and holdings of the transferee. See Estate of Watts v. Commissioner, 823 F.2d 483, 486-487 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Bright v. United States, 658 F.2d at 1005-1006. Consequently, the fact that the 1980 Gifts enabled Robert Furman to gain control of FIC can not be considered.

Both parties agree that a minority discount should be applied in valuing both the 1980 Gifts and 1981 transfers by decedents in the Recapitalization, although we do not understand how respondent's expert determined that both a minority discount and a control premium should be applied, since the two are essentially opposites. We recognize that a hypothetical investor would not be willing to purchase a minority interest in FIC without a significant discount; no matter how successful the corporation, a minority interest in a corporation that does not pay dividends and whose stock does not have a ready market is of limited value.

Petitioners' expert cited three articles on minority discounts. The first, Bolten, "Discounts for Stocks of Closely Held Corporations", 129 Tr. & Est. 47 (Dec. 1990), summarized nine studies regarding discounts for minority interests that indicated a mean discount of 29.63 percent. The second article, "Survey Shows Trend Towards Larger Minority Discounts", 10 Est. Planning 281 (Sept. 1983), summarized the results of a study

conducted by H. Calvin Coolidge that compared the actual sales of minority interests in closely held corporations to the reported book value of those corporations. The Coolidge study found an average discount of 39.9 percent and a median discount of 39 percent against book value. The third article cited by IPC, Pratt, "Discounts and Premia", in Valuation of Closely Held Companies and Inactively Traded Securities 38 (Dec. 5, 1989) (on file with The Institute of Chartered Financial Analysts), summarized several empirical studies regarding both minority and marketability discounts. By analyzing control premium data, Pratt found an implied minority discount of approximately 33 percent for 1980 and 1981 in the studied transactions. Based on the cited articles, IPC determined that a 30-percent minority interest discount was appropriate.

We do not believe that any control premium is warranted. We reject respondent's argument that a swing vote potential existed, since we have found that the transferred shares did not have swing vote potential. We are required to value the shares as if they were transferred to a hypothetical buyer and are not permitted to take into account the circumstances of the actual transferee in valuing the shares.

b. Marketability Discount

Both petitioners and respondent acknowledge the necessity of applying a marketability discount in the valuation but disagree as to the proper percentage. A lack of marketability discount

reflects the fact that there is no ready market for shares in a closely held corporation. Ascertaining the appropriate discount for limited marketability is a factual determination. Critical to this determination is an appreciation of the fundamental elements of value that are used by an investor in making his or her investment decision. Some of the relevant factors include: (1) The cost of a similar company's stock; (2) an analysis of the corporation's financial statements; (3) the corporation's dividend-paying capacity and dividend payment history; (4) the nature of the corporation, its history, its industry position, and its economic outlook; (5) the corporation's management; (6) the degree of control transferred with the block of stock to be valued; (7) restrictions on transferability; (8) the period of time for which an investor must hold the stock to realize a sufficient return; (9) the corporation's redemption policy; and (10) the cost and likelihood of a public offering of the stock to be valued. See Estate of Gilford v. Commissioner, 88 T.C. 38, 60 (1987); Northern Trust Co. v. Commissioner, 87 T.C. 349, 383-389 (1986).

The factors limiting the marketability of stock in FIC in February 1980 and August 1981 included the following: (1) FIC had never paid dividends on its common stock; (2) the corporation was managed and controlled by one individual; (3) the blocks of stock to be transferred were minority interests; (4) a long holding period was required to realize a return; (5) FIC had no

custom or policy of redeeming common stock; (6) because FIC's annual sales were only in the $7 million range, it was not likely to go public; and (7) there was no secondary market for FIC stock. While FIC had significant potential for controlled growth, a healthy balance sheet, and robust earnings growth, we find the factors limiting marketability to be significant.

In concluding that a 35-percent marketability discount should be applied, petitioners' expert cited four articles, including three studies on the sale of restricted stock[17] that have been frequently brought to the attention of this Court. See, e.g., Estate of Jung v. Commissioner, 101 T.C. 412, 435-436 (1993); Mandelbaum v. Commissioner, T.C. Memo. 1995-255 (1995), affd. without published opinion 91 F.3d 124 (3d Cir. 1996); Estate of Lauder v. Commissioner, T.C. Memo. 1992-736; Estate of Friedberg v. Commissioner, T.C. Memo. 1992-310; Estate of Berg v. Commissioner, T.C. Memo. 1991-279, affd. in part and revd. and remanded in part 976 F.2d 1163 (8th Cir. 1992); Estate of O'Connell v. Commissioner, T.C. Memo. 1978-191, affd. in part and revd. in part 640 F.2d 249 (9th Cir. 1981). The first restricted stock study, Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company", 36 J. Taxn. 353 (June 1972), studied the transactions of four large, closed-end

---

[17] Restricted stock is stock acquired from an issuer in a transaction exempt from the registration requirements of the Federal securities laws. Sales of restricted stock are generally restricted within the first 2 years after issuance.

publicly traded investment companies that specialized in restricted securities. The study found mean marketability discounts of 33 percent after analyzing 89 restricted stock investments by the four investment companies. The second study, Moroney, "Most Courts Overvalue Closely Held Stocks", 51 Taxes 144 (Mar. 1973), is based on 10 registered investment companies that held a total of 146 blocks of restricted equity securities. The Moroney study found an average discount on the restricted stock transactions of 35.6 percent. The third study, Maher, "Discounts for Lack of Marketability for Closely Held Business Interests", 54 Taxes 562 (Sept. 1976), is based on reports filed with the Securities and Exchange Commission by four mutual fund companies reporting their restricted stock transactions. The Maher study found a mean discount of 34.73 percent. The final study cited was an IPO study, Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock February 1992 through July 1993", Bus. Valuation Rev. 3 (Mar. 1994). The Emory study found an average marketability discount of 46 percent after comparing the share price in private transactions that occurred within 5 months of an IPO by the same corporation. We find petitioners' reliance on the restricted stock studies to be misplaced, since those studies analyzed only restricted stock that had a holding period of 2 years. Inasmuch as we expect the investment time horizon of an investor in the stock of a closely held corporation like FIC to be long term, we

do not believe that marketability concerns rise to the same level as a security with a short-term holding period like restricted stock.[18]  In light of the foregoing, we find no persuasive evidence in the record to support our reliance on the restricted stock studies in determining an appropriate marketability discount.[19]

### c.    Combined Minority and Lack of Marketability Discount

Respondent has chosen to apply a combined minority and lack of marketability discount of 17 percent, while petitioners seek a minority discount of 30 percent and a marketability discount of 35 percent, which would result in a combined discount of approximately 54.5 percent.  While we take into account the articles cited by petitioners, we are by no means bound by the report of petitioners' expert.  We also recognize that while the minority and marketability discounts may be conceptually distinct, Estate of Newhouse v. Commissioner, 94 T.C. at 249 (1990), the boundaries are often less clear in practice, and the empirical studies cited by petitioners may in fact reflect the

---

[18] That all investors have identical investment horizons is one of the most widely criticized assumptions of CAPM.  See Gilson, "Value Creation by Business Lawyers:  Legal Skills and Asset Pricing", 94 Yale L.J. 239, 252 (1984).

[19] For further discussion and criticism of the use of the Moroney, Maher, and Emory studies to support the application of a marketability discount in the valuation of stock in a closely held corporation, see Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).

resulting uncertainties; see e.g., Dockery v. Commissioner, T.C. Memo. 1998-114 (40-percent combined minority and marketability discount); Estate of Mitchell v. Commissioner, T.C. Memo. 1997-461 (35-percent combined minority and marketability discount); LeFrak v. Commissioner, T.C. Memo. 1993-526 (30-percent combined discount); Estate of Gallo v. Commissioner, T.C. Memo. 1985-363 (36-percent marketability discount, with references to minority issues). We reject both respondent's combined discount of 17 percent and petitioners' separate 30-percent minority discount and 35-percent marketability discount and conclude that a 40-percent combined minority and marketability discount is appropriate in this case.

### d. Key-Person Discount

Where a corporation is substantially dependent upon the services of one person, and where that person would no longer be able to perform services for the corporation by reason of death or incapacity, an investor would expect some form of discount below fair market value when purchasing stock in the corporation to compensate for the loss of that key employee. See Estate of Huntsman v. Commissioner, 66 T.C. 861 (1976); Estate of Mitchell v. Commissioner, supra; Estate of Feldmar v. Commissioner, T.C. Memo. 1988-429; Estate of Yeager v. Commissioner, T.C. Memo. 1986-448. Although FIC could have purchased key-person life insurance on Robert's life, a minority shareholder could not compel FIC to purchase such insurance, and FIC had no such

insurance in effect.

We have found as facts that Robert was a key person in the management of FIC, that FIC had no second layer of management, and that Robert's contacts, experience, and managerial expertise were critically important to the success of FIC. While the operation of a franchised Burger King restaurant might appear to be formulaic, FIC was a growing organization, and Robert's responsibilities extended well beyond the operation of existing restaurants. Moreover, since BKC had considerable control over FIC's costs, expansion opportunities, competition, and ultimately profits, Robert's personal relationships with the founders of BKC were very helpful to the success of FIC. We therefore agree with petitioners and find that a key-person discount of 10 percent was appropriate in determining the value of FIC stock as of February 1980 and August 1981.

Accordingly, we allow a total discount of 46 percent in valuing the FIC common stock transferred by decedents in 1980 and 1981, reflecting a combined minority and marketability discount of 40 percent and a key-person discount of 10 percent.

4. Valuation Conclusions

On the basis of the foregoing, we find that for purposes of computing the taxable gifts of Royal and the taxable gifts and taxable estate of Maude: (1) The fair market value of 24 shares of FIC common stock exchanged by each decedent in 1981 for preferred stock of FIC was $424,552; (2) the fair market value of

the 3,000 shares of preferred stock of FIC received by each decedent in the Recapitalization was $300,000; and (3) after applying the $3,000 annual exclusion, each decedent made a taxable gift to Robert in the Recapitalization in the amount of $121,552. For purposes of computing Maude's taxable estate, we also find that the fair market value of 6 shares of FIC common stock that she transferred to Robert in 1980 was $82,859, resulting in a taxable gift of the same amount.

B.  Additions to Tax

   1.  Failures To File 1981 Gift Tax Returns

For the 1981 taxable year, individuals who were required to file a timely gift tax return but did not do so are subject to an addition to tax equal to 5 percent of the amount of tax that should have been shown on the return, for every month in which the failure to file continues, subject to a maximum of 25 percent. Sec. 6651(a)(1).

The addition to tax for failure to timely file a gift tax return may be avoided if the taxpayer can show that his failure to file was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985); Logan Lumber Co. v. Commissioner, 365 F.2d 846, 853 (5th Cir. 1966) (citing Breland v. United States, 323 F.2d 492 (5th Cir. 1963)), affg. in part and remanding in part T.C. Memo. 1964-126; Home Builders Lumber Co. v. Commissioner, 165 F.2d 1009 (5th Cir. 1948); Estate of Reynolds v. Commissioner, 55 T.C. 172,

202-203 (1970). Reasonable cause exists if a taxpayer exercised ordinary business care and prudence and nevertheless did not timely file a gift tax return. Hollingsworth v. Commissioner, 86 T.C. 91, 108 (1986) (citing Estate of Kerber v. United States, 717 F.2d 454, 455 (8th Cir. 1983)); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; see Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769 (2d Cir. 1950). Willful neglect means a conscious, intentional failure or reckless indifference. United States v. Boyle, supra at 245-246; sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Whether a failure to timely file a gift tax return was due to reasonable cause, and not to willful neglect, is a factual matter to be decided on the basis of the facts and circumstances of each case. The Commissioner's determination of an addition to tax is presumed to be correct and must be disproven by the taxpayer. Welch v. Helvering, 290 U.S. 111, 115 (1933); Epstein v. Commissioner, 53 T.C. 459, 477 (1969).

"Courts have frequently held that `reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." United States v. Boyle, supra at 250 (citing United States v. Kroll, 547 F.2d 393, 395-396 (7th Cir. 1977)); Commissioner v. American Association of Engg. Employment, Inc., 204 F.2d 19, 21 (7th Cir. 1953); Burton Swartz Land Corp. v.

- 49 -

Commissioner, 198 F.2d 558, 560 (5th Cir. 1952); Haywood Lumber &
Mining Co. v. Commissioner, supra at 771; Orient Inv. & Fin. Co.
v. Commissioner, 166 F.2d 601, 602-603 D.C. Cir. (1948);
Hatfried, Inc. v. Commissioner, 162 F.2d 628, 634 (3d Cir. 1947);
Girard Inv. Co. v. Commissioner, 122 F.2d 843, 848 (3d Cir.
1941); Dayton Bronze Bearing Co. v. Gilligan, 281 F. 709, 712
(6th Cir. 1922)).  Thus in some cases, reliance on the opinion of
a tax adviser may constitute reasonable cause for failure to file
a return.  United States v. Boyle, supra at 250-251; Commissioner
v. Lane-Wells Co., 321 U.S. 219 (1944).

Reasonable cause based upon reliance on the opinion of a
competent adviser has been found where the reliance concerned a
question of law, such as whether the filing of a return was
required; a taxpayer's reliance on an adviser ordinarily cannot
supplant his personal duty to ensure the timely filing of any
required return.

> When an accountant or attorney advises a taxpayer on a
> matter of tax law * * * it is reasonable for the
> taxpayer to rely on that advice * * *
>
> By contrast, one does not have to be a tax expert
> to know that tax returns have fixed filing dates and
> that taxes must be paid when they are due.  [United
> States v. Boyle, supra at 251.]

Compare Haywood Lumber & Mining Co., supra at 770-771 (reasonable
cause for failure to file personal holding company surtax returns
where corporation had relied on competent certified public
accountant to prepare income tax returns) and Hollingsworth v.
Commissioner, supra at 108-109 (reasonable cause for failure to

file a gift tax return where attorneys advised the taxpayer that no gift tax liability resulted from transfer of property at fair market value) with Logan Lumber Co. v. Commissioner, supra at 853 (forgetting to file a tax return or failing through inadvertence to see that it is filed does not constitute reasonable cause), and Millette & Associates, Inc. v. Commissioner, 594 F.2d 121, 124-125 (5th Cir. 1979) ("responsibility for assuring a timely filing is the taxpayer's"), affg. T.C. Memo. 1978-180.

Decedents were advised not to file a gift tax return by Messrs. Tishler and Shillington in connection with the transfers made in the Recapitalization. Messrs. Tishler and Shillington concluded that the fair market values of the common stock exchanged and the preferred stock received in the recapitalization were equal, so that no taxable gift had been made.

Respondent argues that the addition to tax is nonetheless applicable because decedents did not rely on a formal appraisal of FIC to determine whether they had made taxable gifts. Respondent's argument is unwarranted on the facts of this case. As we have discussed in our findings of fact, supra, Mr. Tishler is highly experienced in restaurant franchising, and at the time of the Recapitalization, had served as FIC's attorney for approximately 15 years. Mr. Tishler's representation of FIC included tax matters; for instance: (1) In connection with the 1980 Gifts, he had advised decedents to file gift tax returns,

and had signed those returns as preparer; and (2), as discussed, supra, Mr. Tishler had acted on FIC's behalf in requesting a private letter ruling in connection with the Recapitalization. Like Mr. Tishler, Mr. Shillington, a C.P.A., had a longstanding relationship with FIC at the time of the Recapitalization. Having prepared FIC's income tax returns and financial statements since 1959, it is obvious that Mr. Shillington was intimately familiar with FIC's financial affairs. Moreover, as the accountant to other Florida-based Burger King franchisees, Mr. Shillington could draw on his knowledge of industry trends, averages, and conventions in valuing FIC. In sum, in light of the expertise of Messrs. Tishler and Shillington, we think that it was not unreasonable for decedents to rely on their advice not to file a gift tax return.

That decedents received advice that ultimately proved erroneous does not alter our conclusion; valuation is an area of inherent uncertainty. See United States v. Boyle, 469 U.S. at 250. Consequently, we conclude that decedents' failure to file was due to reasonable cause and do not sustain any portion of respondent's additions to gift tax under section 6651(a)(1).

2. Negligence

Section 6653(a) provides for an addition to tax of 5 percent of the underpayment if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations. For purposes of this section, an underpayment generally can be

viewed as the equivalent of a deficiency. Sec. 6653(c)(1). For purposes of section 6653(a), negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1963-66; Elliott v. Commissioner, 90 T.C. 960, 974 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); Larotonda v. Commissioner, 89 T.C. 287, 292-293 (1987); Neely v. Commissioner, 85 T.C. 934, 947-948 (1985); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners bear the burden of proving that the additions to tax determined by respondent should not be applied. Pollard v. Commissioner, 786 F.2d 1063 (11th Cir. 1986), affg. T.C. Memo. 1984-536; Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Axelrod v. Commissioner, 56 T.C. 248, 258 (1971).

For the same reasons that we have found that decedents had reasonable cause for their failures to file gift tax returns, we do not find them to have been negligent by reason of having underpaid their gift taxes. In light of the qualifications and expertise of Mr. Tishler, FIC's attorney, and Mr. Shillington, FIC's accountant, we think that decedents acted reasonably in relying on their opinions. Finally, although the advice rendered to decedents by Messrs. Tishler and Shillington has proven to be erroneous, we do not think, in light of the uncertainty associated with valuation, that their determination of fair

market value was so unreasonable as to render decedents' reliance thereon negligent.  Consequently, we do not sustain any portion of respondent's addition to gift tax under section 6653(a).

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.