T.C. Memo. 1999-278


UNITED STATES TAX COURT


ESTATE OF JAMES WALDO HENDRICKSON, DECEASED,
MARK HART HENDRICKSON, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21225-97.                    Filed August 23, 1999.


<u>Brett J. Miller</u> and <u>Megan J. Kight</u>, for petitioner.

<u>Russell D. Pinkerton</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined a deficiency in petitioner's Federal estate tax of $2,465,624 and an accuracy-related penalty of $477,113 for negligence under section 6662(b)(5).

Unless otherwise noted, all section references are to the Internal Revenue Code in effect at decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, including respondent's concession of the penalty, the sole issue for decision is whether, for purposes of computing the gross estate of James Waldo Hendrickson (decedent), the fair market value of 1,499 common shares of Peoples Trust and Savings Bank of Boonville, Indiana (Peoples), was $4,497,000 ($3,000 per share) as petitioner contends, $8,938,912 ($5,963.25 per share) as respondent contends, or some other amount. We hold that the fair market value was $5,757,296 ($3,840.76 per share).

## FINDINGS OF FACT

Decedent died testate on May 20, 1993 (the valuation date), survived by his two sons: Mark Hart Hendrickson (Mark) and Vinson Eric Hendrickson. Decedent and Mildred A. Hendrickson, the mother of decedent's sons, had been divorced in 1986, after more than 45 years of marriage.

When the petition was filed, Indiana was the residence and principal place of business of Mark and Peoples, respectively, the co-personal representatives of decedent's estate.[1]

---

[1] Under Indiana law, the term "personal representative" includes "executor". Ind. Code Ann. sec. 29-1-1-3 (Michie Supp. 1998). In accordance with decedent's will, we use the term "co-personal representative" exclusively in this case.

A.  Peoples Trust and Savings Bank of Boonville, Indiana

Peoples is an independent bank chartered by the State of Indiana.  It was originally chartered in 1895 and has been in continuous operation ever since.  Peoples has only one office, located in Boonville, Indiana, which has a population of approximately 6,000.  Boonville is the county seat of Warrick County, Indiana, and is located near the southwest corner of the State, approximately 14 miles east of Evansville, Indiana.  The primary customer base of Peoples is Warrick County, which does not include Evansville.  Warrick County is bordered on the west by Vanderburgh County, and on the east by Spencer County.

Decedent's branch of the Hendrickson family has played the leading role in the management of Peoples for more than 50 years. James W. Hendrickson (J.W.), decedent's father, began working at Peoples in 1939, while maintaining a law practice, and eventually became its president.  At his death in 1951, J.W. owned very few shares of stock in Peoples; decedent, who inherited fewer than 10 shares of Peoples stock from J.W., thereupon took over as president, and served as president for 40 years, until 1991, when Mark took over as president.  Like his father, decedent was a practicing lawyer and maintained a solo probate practice during the years he was employed by Peoples.

In 1957, while decedent was away on vacation, members of his extended family attempted to gain control of Peoples.  In order to thwart the attempted hostile takeover, decedent borrowed money

from Old National Bank in Evansville (Old National) to finance his acquisition of sufficient shares of Peoples stock to maintain control. Although decedent acquired small blocks of Peoples stock over the years, he made his major purchases in response to the 1957 takeover attempt.

Mark began his employment with Peoples as a teller in June 1972, following his graduation from college, and was employed by Peoples until his admission to law school in 1974. Following graduation from law school in 1977, Mark returned part-time to Peoples, assisting in the trust department, where he did legal work and handled collection matters. In the mid-1980's, he became a part-time trust officer, a position he maintained until he became president in 1991, after decedent's health started to deteriorate. After Mark became president, decedent assumed the honorary title of Chief Executive Officer (CEO), which was not provided for in the bylaws. Mark's relationship with decedent became increasingly tense and difficult because of their differences of opinion on how Peoples should be managed. While decedent had managed Peoples very conservatively, Mark wanted to adopt a more progressive approach that was favored by younger employees of Peoples.

At the time of his death, decedent was CEO and a director of Peoples and the owner of 1,499 shares of Peoples common stock (the estate shares), representing 49.97 percent of the shares outstanding.

B.   Balance Sheet and Capitalization

As of March 31, 1993 (the reporting date), Peoples had reported total assets of $90.7 million, total liabilities of $70.8 million, and stockholder's equity of $19.9 million.  On the valuation date, the capital structure of Peoples included no debt, other than deposits and other short-term liabilities.

1.   Assets

As of the reporting date, Peoples' assets consisted primarily of net loans of $29.9 million and marketable securities of $54.3 million.  Marketable securities thus represented approximately 60 percent of Peoples' assets, while net loans represented approximately 33 percent.

The bulk of Peoples' investment portfolio consisted of 5-year treasury bonds that had been purchased in the high interest rate environment of the late 1980's and early 1990's.  As of May 1993, a substantial number of those bonds were scheduled to mature in 12 to 24 months, subjecting Peoples to interest rate risk in the lower interest rate environment prevailing at that time.

2.   Stock

a.   Control

On the valuation date, there were 3,000 shares of Peoples common stock outstanding.  The two largest shareholders were decedent (1,499 shares) and Mildred Hendrickson (610 shares).

Mark had 85 shares. The remaining shares were held by 29 shareholders, each of whom held at least 3 shares.

On the valuation date, the estate shares were 49.97 percent of Peoples' outstanding shares, and no other shareholder held an interest of similar size. Although the estate shares were numerically a minority interest, they were a controlling interest in substance. The estate shares had effective control of Peoples, regardless of who owned them.[2] There would be few circumstances in which the estate shares would not determine the outcome of any particular vote, because unless every other shareholder voted against the estate shares, the estate shares would always win. Thus, over time, the holder of the estate shares would in all likelihood be able to determine all, or substantially all, the members of Peoples' board of directors (the board).[3]

---

[2] Because every shareholder owned at least 3 shares, any existing shareholder who acquired the estate shares would automatically acquire actual control, because he or she would acquire a majority interest (1,499 + 3 = 1,502/3,000).

[3] The articles of incorporation of Peoples do not provide for cumulative voting for directors. Although the Indiana general corporate law permits the certificate of incorporation to provide for cumulative voting for directors, Ind. Code Ann. sec. 23-1-30-9(b) (Michie 1999), the Indiana corporate law applicable to financial institutions does not appear to permit cumulative voting. See Ind. Code Ann. sec. 28-13-6-9 (Michie 1996).

b.   Stock Transactions

There was no regular market for Peoples common stock, and transfers were infrequent.  On the valuation date, Peoples did not have an employee stock ownership plan nor any history of repurchasing shares.  Within the 24 months before and after the valuation date, there was only one arm's-length sale of Peoples stock.  In that transaction, which occurred after the decedent's death, in 1994, Julia Raibley, assistant secretary of Peoples, purchased 3 shares at $800 per share from the Stone estate.   In February 1990, after being named to the board, Victor Bowden purchased 10 shares from the Toole Estate in order to comply with the requirement in Peoples' bylaws that members of the board own at least 10 shares of Peoples stock.  Mr. Bowden purchased the shares for $700 per share using funds he borrowed from decedent.  Also in February 1990, the Toole Estate sold 35 Peoples shares to Mark for $700 per share.[4]

In June 1990, decedent transferred by gift 2 shares of Peoples stock to Mark, reducing his interest in Peoples from 1,501 shares (50.03 percent) to 1,499 shares (49.97 percent).  The only reason given by decedent to Mark for the gift was to "round off" Mark's holdings from 83 shares to 85 shares.  Mark

_____

[4] The fair market value per share for Peoples stock reported on the Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, of the Ella Wright Estate in 1989 or 1990 was also $700.

and decedent had not previously discussed a control-breaking transfer such as this one; some years earlier, when Mark had suggested estate planning to decedent, decedent had not expressed any interest.

Although there was no active market for Peoples shares, after Mark became president he occasionally received informal purchase inquiries from representatives of other banks in the area. Peoples did not receive any purchase inquiries from business brokers or investment banking firms.

There was not much of a market for Peoples stock, and shares could not always be sold. For example, sometime prior to Mark's becoming president of Peoples in August 1991, Mark and decedent received telephone solicitation from a representative of Hilliard-Lyons, a Louisville investment banking firm, about purchasing shares from Charlotte Marsh. Mark and decedent both declined. The same shares were still available for purchase in 1993 and again in 1996 or 1997, when Mark was personally solicited by the son of Mrs. Marsh.

c.   Dividend Payments

The board did not declare any dividends between 1984 and 1995. During this time period, Mrs. Hendrickson and her attorney made a demand for dividend payments at an annual shareholders' meeting. Mrs. Hendrickson had received her approximately 20-percent interest in Peoples from decedent as part of her divorce property settlement. The board apparently took no action on her

demand, as no dividends were paid until 1996, when the board declared a $4 million dividend.  In 1998, the board declared a dividend of around $1.5 to $2 million.

### d.    Excess Capital

As a result of not having paid dividends, Peoples, on the valuation date, was overcapitalized, as measured by the ratio of book equity to total assets.  On the reporting date and the valuation date, Peoples had an equity-to-asset ratio of approximately 22 percent; at that time, the average equity-to-asset ratio for Midwestern banks and thrifts with assets less than $150 million was between 7 and 9 percent.   On the valuation date and the reporting date, a 9-percent equity-to-assets ratio would have been a reasonable level of capitalization for Peoples.  On the reporting date, Peoples had equity of $19,918,000, of which $12,919,000 was excess capital.

## C.    Governance and Management

As of the valuation date, Peoples was still incorporated in the State of Indiana and was subject to applicable Indiana corporate and banking law.

### 1.    Shareholder Approval

The articles of incorporation and bylaws of Peoples contain no provisions concerning shareholder voting requirements for mergers, acquisitions, sales of assets, or liquidation. Accordingly, under Indiana corporate law, a plan of merger or

sale of substantially all the assets would have required the approval of no more than a majority of the shares entitled to vote. See Ind. Code Ann. sec. 23-1-40-3(e), 23-1-41-2(e) (Michie 1999); see also Ind. Code Ann. sec. 28-1-7-5 (Michie Supp. 1998).[5]

2.    Board of Directors

On the valuation date, the board of directors comprised eight individuals, the majority of whom were also employed by Peoples. The bylaws of Peoples then in effect provided that two-thirds of the board would constitute a quorum and prohibited the transaction of any business without a quorum. The bylaws also required all directors to own at least 10 shares of stock in Peoples; thus, all the directors were shareholders. In addition to decedent and Mark, the board included the following individuals:

| Name | Position |
| --- | --- |
| Alan Bender | Executive V.P., Senior Loan Officer |
| Alan Bennett | Decedent's friend |
| Victor Bowden | Decedent's godson |
| Florence Davis | V.P., Trust Officer |
| John Farrell | V.P., Loan and Security Officer |
| Richard Johnson | Outside director |

Most of the board members had been selected by the decedent because of their longstanding, personal relationships with him, rather than on account of any relevant expertise. Victor Bowden,

[5] The provision for a vote of two-thirds of the outstanding shares to approve a sale of assets by an Indiana financial institution applies only to such institutions organized after Dec. 31, 1992. See Ind. Code Ann. 28-1-8-4 (Michie 1996).

for example, was a young man whom decedent had supported much like a foster child; John Farrell was a friend from military service in World War II; and Alan Bender used to drive a laundry truck and had the decedent on his route. None of the members of the board had any formal training in banking,[6] and only half the members of the board had attended college. Despite the close relationships of the other board members to decedent, however, they were not a rubber stamp for decedent and Mark. The other directors were strong-willed independent thinkers who contributed to the board's deliberations. Moreover, those directors who were also officers could use their positions as employees to subvert any board decision with which they were in disagreement. But, while the board was not a rubber stamp, many of the directors thought similarly to decedent and were resistant to change.

### 3. Financial Management and Reporting

#### a. Outside Accountant

Peoples' longstanding regular accountant and auditor was Ronnie Robinson, a sole practitioner in Evansville. Mr. Robinson had no other financial institutions as clients.

---

[6] Mark completed graduate banking training at the University of Wisconsin in 1996. After the valuation date, Tony Aylsworth, chief operating officer of Peoples since February 1998 (but not a member of the board), also completed graduate banking training at the University of Colorado, Boulder.

b.  Budgeting

Peoples did not prepare budgets until 1991, after being forced to do so by the FDIC.  The budgets were prepared one quarter at a time by Julia Raibley.

c.  Earnings

In the years 1991-93, Peoples enjoyed an unusually high yield curve, because of the spread between the rates of interest received on securities and loans over interest paid on savings accounts and certificates of deposit.

By the time of decedent's death, Peoples had begun performing interest rate sensitivity analyses; however, its methods of doing so were criticized as unreliable by the FDIC examiners.

Peoples did not follow the practice of forecasting its earnings.

D.  Operations

1.  Employees

On the valuation date, Peoples had approximately 30 employees, most of whom were in their mid-50's or older.  Peoples had no retirement plan, but it also had no mandatory retirement age.  As a result, Peoples had employees in their 70's and 80's. In general, Peoples had a good relationship with its employees, resulting in very little turnover and a median term of employment of 17-1/2 years.  However, there was some friction between

tellers and bookkeepers on the one hand, and loan officers on the other, resulting in little mingling between the two groups.

2.    Facilities

The operations of Peoples were housed in a two-story building built in 1964; Peoples had no branches.  Peoples' facilities and equipment were in average condition and considered adequate for its operations.

When Mark became president, Peoples was for the most part operating with 1960's technology.  Most operations in the bank were done manually, and there were no information systems to keep track of customers' credit, payments, or deposits.  Peoples did not have any ATM machines.  Peoples had desktop PC's for use by loan officers and customer service representatives, but only to print out loan applications, signature cards, and other operational documents.  Under Mark's direction, however, Peoples had entered into a contract with Old National to provide electronic data processing (EDP) applications for deposits, loans, and accounting.  Although many of the directors were hesitant about learning the new technology, they reluctantly cooperated.  During 1991 and 1992, Peoples converted its system of accounting for its loan portfolio from a manual system to a computerized system and began having its loans serviced by Old National; however, on the valuation date, the complete conversion of Peoples to the Old National EDP applications had not been completed.

Security at Peoples was antiquated.  Despite a number of bank robberies in the area, Peoples had little protection from armed robbery or burglary.  Security at the bank consisted of glass doors that could be locked and two 1960's vintage still image security cameras.  Peoples did not employ security guards or arm its employees and did not have a central alarm system.  In the event of a robbery, Peoples did have a system in place to activate a silent alarm that would notify the sheriff if bait money should be removed from a teller bay.  However, at the time of decedent's death, the physical cash was not carefully managed, and tellers frequently kept as much as $80,000 in their cash drawers.

3.   Franklin Loan and Savings Association

On the valuation date, the Franklin Loan and Savings Association (Franklin) was affiliated with Peoples.  Franklin did not have its own facilities or employees and used those of Peoples.  Franklin paid Peoples for employee time used, along with an annual rent of $600.

4.   Depository Accounts

a.   Checking Accounts

On the valuation date, Peoples offered "free" checking accounts that really were free.  There were no monthly charges,[7]

---

[7] Peoples charged a fee on dormant accounts as provided by State law.

minimum balances, or charges for transactions.  In fact, until shortly before decedent's death, Peoples provided checking account customers with free printed blank checks; even after Peoples decided to charge for checks, it charged customers only for actual printing costs with no markup.  As a result of Peoples' generous checking account policy, there were approximately 4,000 checking accounts open at Peoples on the valuation date; however, approximately 1,200 of those accounts had an average daily balance of less than $200 and total checking account deposits amounted only to approximately $1 million.  As a result, most checking accounts were unprofitable for Peoples, inasmuch as the costs of servicing the accounts exceeded earnings on the deposits.

b.    <u>Savings Accounts</u>

On the valuation date, Peoples had $7 to $8 million in deposits in savings accounts.

c.    <u>Certificates of Deposit</u>

The overwhelming majority of Peoples' deposits were attributable to certificates of deposit.  Those deposits included "hot money", large deposits that come from a wide geographic area in search of the best interest rate.  Hot money is a volatile source of deposits because it is likely to be withdrawn anytime a better interest rate is being offered by another depository institution.  Peoples was not interested in pursuing or retaining hot money, because, as discussed <u>infra</u>, it did not have

sufficient loan demand to pay the yields demanded by hot money depositors.

    5.   Lending Activities

       a.   Loan Products

As of the reporting date, Peoples' loan portfolio was heavily concentrated in real estate. Over 90 percent of Peoples' loan portfolio was in real estate loans, of which 76.59 percent were loans on 1 to 4 family residential real estate. Most real estate loans made by Peoples were for existing properties, rather than new construction. Peoples' concentration of loans in 1 to 4 family residential real estate placed it in the 98th percentile in comparison to its peer institutions.

Peoples offered few choices in the way of loan products to real estate borrowers. It did not offer adjustable rate mortgages[8] (ARM's) or home equity loans[9] and did not participate in any FHA or VA mortgage programs. Fixed-rate mortgages were offered only with a 15- or 20-year term; a 30-year term, often favored by first-time home buyers because of the lower monthly payments, was not available. Also discouraging to first-time home buyers, Peoples' loan-to-value (LTV) and loan limit

---

[8] Peoples did not have sufficient information technology to comply with regulations concerning the disclosures required to be made to consumers with respect to adjustable rate mortgage borrowers.

[9] Peoples now offers home equity loans.

restrictions required significantly greater downpayments than competing lenders. While its competitors were lending on an 80-percent LTV, or as high as 90 to 95 percent with private mortgage insurance (PMI), Peoples required an LTV ratio of 70 percent. Although Peoples raised its LTV requirement to 80 percent in 1993, discussed infra, it did not offer any programs using PMI to lower the borrower's downpayment. Finally, Peoples' $250,000 lending limit required proportionately larger downpayments on more expensive homes than competitors. With a maximum mortgage loan of $250,000, any house with a purchase price of more than $312,500 would require a downpayment greater than 20 percent.

Peoples generally avoided making other types of consumer loans, such as credit cards, automobile leasing, and automobile financing. Although it technically offered automobile financing, Peoples set rates above market because it was not interested in making automobile loans, due to concerns over whether it had sufficient personnel to track automobile documentation (insurance, titles, etc.) and deal with collections. Such automobile loans as were made were mainly to Peoples' employees.

As of the reporting date, only 2.13 percent of the Peoples loan portfolio was in commercial and industrial loans, placing Peoples in the 4th percentile (very low) in comparison to its peers. Peoples generally did not make commercial loans, had only one revolving line of credit open, and did not offer letters of credit. After Mark became president, and before decedent's

death, Peoples tried to start a Small Business Administration (SBA) loan program, but was unsuccessful in submitting loan applications to the SBA because of inadequate documentation.

In sum, although Peoples' charter permitted it to offer a broad range of lending products to consumer and commercial borrowers, Peoples in practice generally failed to serve all but a select class of home buyers who were not discouraged by Peoples' LTV, loan limit, 20-year maximum term, and lack of ARM's.

### b.   Loan-To-Asset Ratio

The effects of Peoples' narrowly defined market and conservative lending practices are readily apparent.  During the 4-year period ending on the valuation date, Peoples' net loans as a percentage of assets averaged 30 percent.  Peoples' peers, in comparison, averaged 52 to 55 percent.  After Mark became president of Peoples, he tried to raise Peoples' loan-to-asset ratio significantly and set a goal of 60 to 70 percent for 1993, a rate that had not been achieved as of the date of trial.  Aside from adopting a more aggressive stance in the market, Peoples could also have achieved an increased loan-to-asset ratio by reducing its assets by declaring a substantial dividend.

On March 1, 1992, Joe Melhiser was hired as an assistant vice president from another bank in an effort to increase lending.  As part of the effort to increase lending, Peoples raised its LTV to 80 percent in 1993.  Although the increased LTV

triggered concerns at Peoples over increased risks of default or delinquency, Peoples did not raise its interest rates.

c.    Loan Underwriting and Documentation

Loan decisions were made by a four-person loan committee on the basis of a loan application.  Peoples' underwriting procedures were criticized by the FDIC for a number of shortcomings.  Until early 1993, for example, Peoples did not require credit reports or title insurance for residential mortgage loans and did not check whether flood insurance was required on the property being financed.[10]  Contrary to standard industry practice, Peoples made loans without verifying the market value of the underlying collateral through independent appraisal.  Instead, Peoples used less reliable in-house appraisals that did not conform to the format used by independent appraisers.  In some cases, Peoples even recycled old appraisals of a property, rather than obtaining a new appraisal that would reflect current market values.

Unlike most mortgage lenders, Peoples did not sell any mortgage loans in the secondary mortgage market.  Peoples had unsuccessfully tried to sell mortgage loans in the past to Fannie Mae and Freddie Mac but did not have underwriting practices and documentation sufficient to comply with the standards of the

---

[10] There was a high likelihood of flooding in some areas served by Peoples; the Ohio River is the southern boundary of Warrick County.

secondary market.  In any event, Peoples needed to retain ownership of the mortgage loans it made, because its supply of funds exceeded the demand for its mortgage loans--selling the mortgages would have further compromised Peoples' net interest margin and earnings.

### d.   Loan Monitoring

Peoples monitored loans using paper ledger cards that were stored in pockets that tracked the day of the month on which each loan was due, so that if the loan was past due, the card would remain in what would become a "past due" pocket instead of being put in a current pocket.

Meetings concerning delinquent loans were held by Peoples' loan committee.  Peoples also had watch lists of problem loans as required by the FDIC examiners, but they were not used by Peoples to monitor loans.

### 6.   Fee Income

Income from fees can make a significant contribution to the income of a bank.  Banks may earn income or fees from points and origination fees on loans, ATM fees, trust fees, credit card fees, servicing agreements, and insurance sales.  Peoples generally charged no points or fees, however, and had only minimal fee income from its activities.  Peoples did not service loans made by other depository institutions.

E.   Regulation and Monitoring

   1.   Classification, Regulation, and Insurance

The banking industry includes both commercial banks and thrifts.  While there is some overlap, commercial banks generally provide a wider range of banking services than thrifts, whose principal mission is financing home ownership.  There are also some differences in ownership.  Commercial banks are always owned as stock companies, while thrifts may be stock-owned or mutually owned.  Commercial banks and stock-owned thrifts are frequently owned by a bank holding company owning one or more institutions.  Although most thrifts are mutually owned, stock companies account for more than two-thirds of the assets of thrifts.

   Both banks and thrifts can be federally or State chartered and are generally insured by either the Bank Insurance Fund (BIF) or Savings Association Insurance Fund (SAIF) of the Federal Deposit Insurance Corporation (FDIC).  BIF insures all federally-chartered commercial banks, most State-chartered commercial banks, and some State-chartered thrifts.  SAIF insures all federally-chartered and some State-chartered, thrifts.  Since July 1, 1991, SAIF- and BIF-insured institutions have paid the same level of deposit insurance premium (0.23 percent of deposits).

On the valuation date, Peoples was chartered by the State of Indiana with the powers of a commercial bank and was BIF-insured. As a result, Peoples was subject to regulation at the Federal

level by the FDIC and at the State level by the Department of Financial Institutions of the State of Indiana (IDFI). The FDIC and the IDFI share regulatory responsibilities and exchange documents, reports and examinations, and correspondence concerning the institutions that they both supervise and regulate.

Although Peoples was chartered with the powers of a commercial bank, it displayed the characteristics of a thrift. Its loan portfolio was heavily concentrated in residential real estate loans that were held until maturity; Peoples did not sell or service loans. The asset structure of Peoples was heavily weighted toward investment securities, and the loan-to-deposit ratio was below 50 percent. Despite the powers granted under its charter, Peoples was not equipped to operate as a commercial bank without significant expenditures to update its systems and procedures to process commercial lending and deposit products. Accordingly, for purposes of valuing the estate shares, Peoples should be treated as a thrift, rather than a commercial bank.

### 2. Safety and Soundness

Both FDIC and IDFI conduct regular compliance and safety and soundness examinations of Peoples using a composite ratings system based on six areas of concern: (1) Capital adequacy, (2) asset quality, (3) management competency, (4) earnings level and trend, (5) level of liquidity, and (6) interest rate sensitivity. FDIC conducted examinations of Peoples as of the

close of business November 10, 1990, and December 11, 1992; IDFI conducted an examination as of March 14, 1992. In all three cases, Peoples received a uniform composite rating of one (1), the highest possible rating. Institutions earning a uniform composite rating of one (1) are basically sound in every respect and are considered to be resistant to external economic and financial disturbances and more capable of withstanding the vagaries of business conditions than institutions with lower ratings. Nevertheless, in their reports with respect to the 1992 examinations, both FDIC and IDFI expressed concern over Peoples' liability sensitive position and cautioned that earnings could be negatively impacted during a period of rising interest rates. The FDIC also expressed concern over shortcomings in various policies and procedures of Peoples, including financial reporting, underwriting, and budgeting, although apparently not of sufficient magnitude to affect Peoples' top rating.

> 3. Community Reinvestment Act

The Community Reinvestment Act (CRA), title VII of the Housing and Community Development Act of 1977, Pub. L. 95-123, sec. 802, 91 Stat. 1147, currently codified at 12 U.S.C. sec. 2901 (1994), was enacted by Congress to encourage depository institutions to help meet the credit needs of the communities in which they operate, including low- and moderate-income neighborhoods, consistent with safe and sound banking operations. CRA requires that each insured depository institution's record in

helping meet the credit needs of its entire community be evaluated periodically. That record is taken into account in considering an institution's application for deposit facilities, including mergers and acquisitions. CRA examinations are conducted by the Federal agencies that are responsible for supervising depository institutions, such as FDIC and the Office of Thrift Supervision (OTS). Inasmuch as Peoples was insured by FDIC, it was subject to FDIC examination with respect to its CRA compliance. Peoples' designated CRA area included all of Warrick County. Peoples reduced the size of its CRA area in August 1992 at the suggestion of an FDIC examiner because of its compliance difficulties. If Evansville had been included in Peoples' designated CRA area, Peoples would have had significantly greater difficulty complying, because it would have had to prove it was fairly serving Evansville's low- and moderate-income neighborhoods.

Peoples received CRA performance ratings of "needs to improve" on two occasions. In its CRA Performance Report as of the close of business on November 10, 1990 (first CRA report), FDIC cited three principal CRA compliance issues: (1) Lack of adequate effort by Peoples to determine the credit needs of the community, (2) lack of adequate effort by Peoples to publicize the types of loans it offered, and (3) generally conservative lending practices. In a memorandum of understanding dated March 13, 1991 (first MOU), and signed by all directors of

Peoples, Peoples agreed to address the CRA compliance issues raised by the FDIC in the first CRA report.

In a CRA Performance Report as of the close of business August 31, 1992 (second CRA report), FDIC identified additional CRA compliance problems, including: (1) Lack of formal training by Peoples of its employees on CRA compliance, (2) failure by Peoples to monitor its own performance in complying with the CRA, (3) failure by Peoples to review its lending patterns for evidence of discriminatory lending practices, (4) loan-to-deposit ratio, (5) low volume of farm and business credit extended, and (6) lobby hours significantly below that of the competition. In response to the second CRA report, the directors of Peoples signed another Memorandum of Understanding on October 7, 1992 (second MOU).

Within a month after signing the second MOU, in an attempt to improve its CRA compliance, Peoples created a new position--compliance officer--and hired Thomas Krochta, a local attorney, to do the job. Nevertheless, on December 31, 1992, as Mr. Krochta was settling into his new position, Simona L. Frank, Chicago regional director of FDIC's Division of Supervision, wrote to the board expressing concern over Peoples' continued noncompliance and requesting immediate corrective action. Ms. Frank said that she planned to recommend to the national office of the Division of Supervision that Peoples continue to be designated a "problem bank" under the CRA. As a result of the

"problem bank" designation, Peoples was subjected to a very high level of scrutiny in future examinations by the FDIC; examinations were conducted more frequently; greater correspondence between Peoples and the FDIC was required; and Peoples could have been prohibited from any merger, acquisition, divestiture, or expansion activity. Designation as a "problem bank" also excluded Peoples from bidding on the assets of failed financial institutions. Continued failure to comply with the CRA could have resulted in a cease-and-desist order by the FDIC, with the ultimate sanction of forced closure.

Peoples' CRA compliance costs were significant for a bank its size. In addition to the additional demands on management imposed by the CRA requirements, Peoples was forced to hire two full-time attorneys to oversee its CRA compliance. In February 1993, shortly after hiring Mr. Krochta, Peoples hired Tony Aylsworth, another local attorney as an assistant vice president and assistant compliance officer. Mr. Aylsworth's first assignment at Peoples was "scrubbing" the loan files. "Scrubbing" as used in this context, refers to the process of reviewing loan files to see if they contain adequate documentation, and correcting any documentation problems discovered, such as missing documents or signatures. Inadequate loan documentation was a contributing factor in Peoples' CRA compliance difficulties, because Peoples was unable to show why and where it was denying certain loans. Until decedent's death

on May 20, 1993, he worked closely with Mr. Aylsworth on the "scrubbing" project.

On July 22, 1993, the FDIC notified Peoples that it had demonstrated compliance with only about half of the terms and conditions of the second MOU. Not until early 1994 did Peoples finally achieve compliance with the second MOU. In October 1994, Mr. Aylsworth ceded his position as assistant compliance officer and became a trust officer, a position he held until February 1998, when he became chief operating officer.

### 4. Third-Party Monitoring

Peoples was highly regarded by regulators and the banking community for its safety and soundness and was recognized by the following bank rating services:

| Rating service | Rating |
| --- | --- |
| Veribank Inc. | Blue ribbon bank |
| Bauer Financial Reports | Five star bank |
| Sheshunoff Information Services | Listed in highest rated banks in America |

## F.  Market Conditions

### 1. Banking Industry

In 1993, the banking industry was still recovering from the recession of the early 1990's, and--in the case of thrifts--from the savings and loan crisis. The first quarter of 1993 was the first time since 1989, when the savings and loan industry bailout was introduced, that no savings banks had failed. Prospects for

the industry were encouraging as a result of low interest and inflation rates that led to increased consumer borrowing and spending, increased production and expansion, and lower unemployment.

2. Competition

Peoples' main competitors in Boonville were Old National, Warrick Federal Credit Union (the Credit Union), and Boonville Federal Savings Bank. Old National and the Credit Union both had competitive positions superior to that of Peoples. Among its Boonville competitors, Peoples was considered to be something of a dinosaur. Peoples had been losing customers since the Credit Union opened. In comparison to its competitors, Peoples' only advantage was in the low costs and fees it offered on home mortgages, along with a competitive interest rate.

Peoples also faced competition from large commercial banks in Evansville that had presences in other parts of southern Indiana: (1) Old National; (2) CNB Bancshares; and (3) National City Bancshares. However, all three Evansville banks were trying to grow through acquisition, so while they may have posed a competitive threat, they were also a potential acquirer of Peoples. Old National's Boonville branch, for example, had resulted from Old National's acquisition of a local bank.

3. Local Economy

On the valuation date, the local economy served by Peoples was growing slowly. In Boonville, the largest employer was the School Corporation. In Warrick County, the two largest employers, Alcoa and Peabody Coal, were both significantly downsizing. Alcoa, which previously employed 3,500 to 4,000 local workers, was reducing its local workforce by one-third, while Peabody Coal was reducing its local workforce by two-thirds, to fewer than 200 employees. Another coal mining concern, Amax, had ceased local mining operations entirely. The area served by Peoples also contained a Whirlpool manufacturing plant and some farming activity. Despite the negative developments in the Warrick County economy, many residents of Warrick County worked in Evansville, which was experiencing modest growth.

On April 16, 1987, the U.S. District Court for the Southern District of Indiana entered a consent judgment in an action filed by the U.S. Environmental Protection Agency (EPA) against the State of Indiana and the City of Boonville. EPA had initiated the action because Boonville's sewage treatment facilities were overloaded, resulting in the discharge of insufficiently treated wastewater, in violation of the Clean Water Act[11] and other Federal laws. The consent judgement required Boonville to

---

[11] Water Quality Act of 1987, Pub. L. 100-4, sec. 1(a), 101 Stat. 7, currently codified as 33 U.S.C. sec. 1251 (1994).

prohibit "all new sewer connections" (sewer tap ban) until it could demonstrate compliance with all remedial provisions of the consent judgment. EPA could grant waivers from the sewer tap only under very limited circumstances:

> Waivers from this sewer ban for new sources may be granted * * * only if EPA determines that the proposed connection will eliminate an existing health hazard and the resulting public health benefit outweighs the adverse impact of any reduction in wastewater effluent quality.

The sewer tap ban made it very difficult to obtain commercial or residential building permits in Boonville and was considered a high priority issue by the Boonville Board of Public Works,[12] but it did not bar new construction elsewhere in Warrick County. On the valuation date, Newburgh, a suburb of Evansville, was one area in Warrick County where new home construction was active, primarily single-family homes priced between $300,000 to $400,000. However, because of its conservative lending practices (described supra pp. 16-19), Peoples could not serve the needs of younger cash-poor borrowers who could otherwise afford to purchase a $300,000 to $400,000 house.

Although Peoples was located only 14 miles from Evansville, Peoples generally chose not to engage in lending activities in Evansville, or its surrounding county, Vanderburgh County.

---

[12] Tony Aylsworth, an officer of Peoples since February 1993, served on the Boonville three-person Board of Public Works from January 1996 until February 1998.

Peoples avoided making loans in Vanderburgh County because its conservative-minded loan officers were unfamiliar with the area and its values and because adding Evansville to Peoples' designated CRA area would have increased Peoples' CRA compliance requirements.

G.   Estate Tax Return

Decedent's co-personal representatives executed and timely filed a United States Estate (and Generation-Skipping Transfer) Tax Return, Form 706, on August 8, 1994.[13]  The Form 706 had been prepared by Jeffrey B. Baker, a certified public accountant and certified financial planner.  Decedent's 1,499 shares of Peoples common stock were included on Schedule B of the Form 706.  Of the 1,499 shares, the Form 706 reported 1,486 shares at a value of $3,159,726 ($2,126 per share), and 13 shares at a value of $10,400 ($800 per share).

The $2,126-per-share value reported on the Form 706 was based on a valuation of the estate shares by Harding Shymanski & Company, P.C. (HSC), an Evansville, Indiana, public accounting firm.  HSC valued the Peoples' total equity on a minority basis using the weighted average value under three different valuation methods.  The three methods and their weightings were:  (1) Capitalized earnings (30 percent), (2) price/earnings multiple

---

[13] Petitioner requested and received a timely extension of time for filing the Form 706.

(30 percent), and (3) price/book multiple (40 percent).  After computing the weighted average value of total equity on a minority basis, HSC applied a 30-percent marketability discount, and divided the result by 3,000, the total number of shares of Peoples common stock outstanding, to determine the fair market value of the estate shares on a per share basis.  Petitioner did not use HSC as an expert witness in this case.

On July 25, 1997, respondent timely mailed petitioner a notice of deficiency with respect to its estate tax liability.  The notice of deficiency determined a value of $8,938,912[14] for the estate shares, based upon an appraisal prepared by David F. Fuller of Business Valuation Services, Inc., who acted as respondent's expert witness in this case.

H.   Lack of Marketability

On the valuation date:  (1) Peoples had few opportunities for growth; (2) Peoples' earnings were subject to significant interest rate risk; (3) Peoples had no employee stock option plan or history of repurchasing shares; and (4) there was no readily available public or private market for Peoples stock.  Each of these conditions contributed to a lack of marketability of Peoples stock.

---

[14] The redetermined value of the estate shares in the notice of deficiency and the amount asserted at trial by respondent are essentially the same; they differ only because respondent's expert rounded certain figures in his report. See discussion _infra_ of respondent's expert.

ULTIMATE FINDING OF FACT

On the valuation date, the fair market value of the estate shares was $5,757,296 ($3,840.76 per share).

OPINION

The issue for decision is the fair market value on the valuation date (May 20, 1993) of 1,499 shares of Peoples common stock included in decedent's gross estate.

Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part on another ground T.C. Memo. 1956-178; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Skripak v. Commissioner, 84 T.C. 285, 320 (1985).

Fair market value is defined for Federal estate and gift tax purposes as the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all the relevant facts and neither being under compulsion to buy or to sell. See United States v. Cartwright, 411 U.S. 546, 551 (1973) (citing sec. 20.2031-1(b), Estate Tax Regs.); see also Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the peculiar characteristics of

these hypothetical persons are not necessarily the same as the individual characteristics of an actual seller or an actual buyer. See Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, supra at 218; see also Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595. The hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage. See Estate of Curry v. United States, supra at 1428; Estate of Newhouse v. Commissioner, supra at 218. This advantage must be achieved in the context of market and economic conditions at the valuation date. See Estate of Newhouse v. Commissioner, supra at 218.

For Federal estate tax purposes, the fair market value of the subject property is generally determined as of the date of death of the decedent; ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the subject property on some later date. See sec. 20.2031-1(b), Estate Tax Regs.; see also First Natl. Bank v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Newhouse v. Commissioner, supra at 218; Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987).

Special rules apply to the valuation of the stock of a closely held corporation. While listed market prices are the

benchmark in the case of publicly traded stock, recent arm's-length transactions generally are the best evidence of fair market value in the case of unlisted stock.  See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979); Estate of Branson v. Commissioner, T.C. Memo. 1999-231.  Where the value of unlisted stock cannot be determined from actual sale prices, value is best determined by taking into consideration the value of listed stock in comparable corporations engaged in the same or a similar line of business, as well as all other factors bearing on value, including analysis of fundamentals.  See sec. 2031(b); Estate of Newhouse v. Commissioner, supra at 217; Estate of Hall v. Commissioner, supra at 336.  The factors that we must consider are those that an informed buyer and an informed seller would take into account.  See Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  Rev. Rul. 59-60, 1959-1 C.B. 237, "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value", Estate of Newhouse v. Commissioner, supra at 217; it lists the following factors to be considered, which are virtually identical to those listed in section 20.2031-2(f), Estate Tax Regs.:

    (a) The nature of the business and the history of the enterprise from its inception.

    (b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. [Rev. Rul. 59-60, 1959-1 C.B. at 238-239.]

As is customary in valuation cases, the parties rely primarily on expert opinion evidence to support their contrary valuation positions. We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. See Anderson v. Commissioner, supra; Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318. Expert testimony sometimes aids the Court in determining values; sometimes it does not, particularly when the expert is merely an advocate for the position argued by one of the parties. See, e.g., Estate of Halas v. Commissioner, 94 T.C.

570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989).  We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment.  See Helvering v. National Grocery Co., 304 U.S. at 295; Anderson v. Commissioner, 250 F.2d at 249; Estate of Newhouse v. Commissioner, 94 T.C. at 217; Estate of Hall v. Commissioner, 92 T.C. at 338.  Where necessary, we may reach a determination of value based on our own examination of the evidence in the record.  See Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285); Ames v. Commissioner, T.C. Memo. 1990-87, affd. without published opinion 937 F.2d 616 (10th Cir. 1991).  Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962).  We have broad discretion in selecting valuation methods, see Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and in determining the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.  Moreover, while we may accept the opinion of an expert in its entirety, Buffalo Tool & Die

Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, Parker v. Commissioner, supra at 561.  Finally, because valuation necessarily results in an approximation, the figure at which we arrive need not be directly attributable to specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence.  See Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

1.   Respondent's Expert

Respondent relies on the expert report of David N. Fuller, a principal in the Dallas, Texas, office of Business Valuation Services, Inc. (BVS).  Mr. Fuller has worked in business valuation since he graduated from Southern Methodist University in 1989 with an M.B.A. in finance.  He was a Manager in the Valuation Group at Deloitte & Touche from 1989 until 1992, when he became associated with BVS.  Mr. Fuller is an Accredited Senior Appraiser and Chartered Financial Analyst.  Mr. Fuller valued the estate shares at $8,939,000 ($5,963.25 per share) using the weighted average value of the estate shares under an income approach and a market approach, reduced by a marketability discount of 10 percent.

a.   <u>Discounted Cash-Flow</u>

The income approach employed by Mr. Fuller was the discounted cash-flow method (DCF).  A DCF analysis attempts to measure value by forecasting a firm's ability to generate cash and discounting the flows to present value using the firm's cost of capital.  There are three components to the DCF analysis:  (1) The cash-flow projections over the forecasted period; (2) the terminal value; and (3) the appropriate discount rate.  Using DCF, a firm's value is calculated as the discounted present value of the forecasted cash-flow from operations plus the discounted present value of the terminal value.  See Brealey & Myers, Principles of Corporate Finance 30, 64, G4 (4th ed. 1991).

Before performing his DCF analysis, Mr. Fuller reduced the operating assets shown on Peoples' balance sheet in order to project Peoples' free cash-flow from operations (FCF).  Mr. Fuller made these adjustments because he considered Peoples to be overcapitalized, as measured by its ratio of book equity to assets.  With total equity of $19,918,000 and total assets of $90,689,000 on the reporting date, Peoples had a book equity-to-assets ratio of 22 percent.[15]  In comparison, according to Mr.

---

[15]   The pro forma balance sheet prepared by Mr. Fuller as of May 20, 1993, showed total equity of $20,772,000 and total assets of $94,948,000, resulting in a similar book equity-to-assets ratio.

Fuller, the average of Peoples' "peer group"[16] was only 7.9

percent.  Mr. Fuller considered a 9-percent book equity-to-assets

ratio to be a reasonable level of capitalization for Peoples,[17]

and, accordingly, he reduced the balances of Peoples' total

assets and total equity accounts by $12,919,000--the amount

necessary to lower Peoples' book equity-to-asset ratio to 9

percent, resulting in adjusted total equity and total assets of

$6,999,000 and $77,770,000, respectively.  Mr. Fuller then

treated the $12,919,000 in assets removed in his adjustments as

_____

[16] The depository institutions comprising Peoples' peer
group are determined by The Federal Financial Institutions
Examination Council (FFIEC), an entity established by
Congress in 1978 to promote consistent examination and
supervision of financial institutions.  Members in the FFIEC
include the Comptroller of the Currency, the Chair of the
FDIC, and a member of the Federal Reserve Board of
Governors.

     Peer group data is used by the FFIEC in Uniform Bank
Performance Reports, which are issued by the FFIEC for every
insured bank on a quarterly basis.  The FFIEC assigns each
bank or holding company to a particular peer group based
upon asset size and number of branches or banks.  Mercer,
Valuing Financial Institutions 61, 143 (1992).  Peoples'
peer group consisted of 43 commercial banks and 6 thrifts
operating in Indiana, Illinois, Ohio, and Kentucky, with
average total assets of approximately $82 million.

[17] We note that the 9-percent figure used by Mr. Fuller
was very close to the average equity-to-assets ratios for
the guideline companies selected by petitioner's expert,
James E. Magee, of Alex Sheshunoff & Co. Investment Banking,
discussed infra.  Mr. Magee used two groups of guideline
company data:  One that was based on controlling interest
transactions, and one that was based on minority interest
transactions.  The average equity-to-asset ratios for the
two groups were 9.05 percent and 8.57 percent, respectively.

nonoperating assets, whose income would not be included in Peoples' FCF.

Mr. Fuller forecasted Peoples' FCF for 5 years forward (the valuation horizon), and computed a terminal value using the Gordon dividend growth model (Gordon model). The Gordon model is a model for estimating the terminal value of a going concern, which assumes that FCF will continue indefinitely and grow at a constant rate. For purposes of computing the terminal value under the Gordon model, Mr. Fuller assumed that Peoples' FCF would continue indefinitely, growing at a rate of 1.5 percent annually. In forecasting FCF for the valuation horizon and the terminal value, Mr. Fuller took into account the earnings impact of removing $12,919,000 from operating assets. Mr. Fuller assumed that such a reduction would reduce Peoples' net interest income, rather than loan income, because Peoples could readily dispose of marketable securities, while its loans had proven to be unmarketable. Accordingly, Mr. Fuller forecasted Peoples' net interest income at approximately $1.1 million less than Peoples' reported net interest income for the calendar year 1992--a sufficient amount to reflect the loss of an approximately 8-percent return on the nonoperating assets.

Mr. Fuller estimated Peoples' cost of capital using a weighted average cost of capital (WACC) formula and calculated Peoples' cost of equity using the standard capital asset pricing model (CAPM) formula. The cost of equity was calculated using a

7-percent risk-free rate, a risk premium of 7.3 percent, and a beta of "about 1.0, approximately equal to the overall market average of 1.0".

Mr. Fuller calculated beta using the average unlevered beta[18] for the 23 publicly traded Midwestern banks tracked by the Value Line Investment Survey (4th ed. Apr. 9, 1993) (the VL list). The VL list included the leading full-service commercial banks in the Midwest, such as Banc One Corp., First Chicago Corp., National City Corp., and Norwest Corp. The VL list did not contain any small, single-location banks such as Peoples; all the banks on the VL list were substantially larger. The market capitalizations of the banks on the VL list ranged from approximately $700 million to $15 billion, with mean and median capitalizations of approximately $3.76 billion and $2.88 billion, respectively.

After calculating unlevered betas for each of the companies, Mr. Fuller calculated an average unlevered beta of 0.9 and an average relevered beta of 1. Despite the fact that Peoples was unleveraged, Mr. Fuller chose a beta of 1, the same as the average relevered beta.

---

[18] An unlevered beta measures the business risk of a company by removing the effect of financial leverage. This permits the betas of comparison companies to be considered so that business risk can be isolated and evaluated apart from the risks associated with financial leverage. Copeland et al., Valuation: Measuring and Managing the Values of Companies 331 (2d ed. 1994).

Using the 14.3-percent discount rate he calculated under CAPM, Mr. Fuller calculated discounted present values of $3,480,000 and $4,660,000 for Peoples' FCF for the valuation horizon, and its terminal value, respectively, for a value from operations of $8,140,000. He then added back the book value of the nonoperating assets, net of a 10-percent minority discount, to arrive at a total equity value of $19,770,000 ($6,590 per share).

There are significant shortcomings in Mr. Fuller's application of CAPM in this case that highlight our doubts over the appropriateness of its application to the valuation of small, closely held companies. As we said recently, "CAPM is a financial model intended to explain the behavior of publicly traded securities", and we "do not believe that CAPM and WACC are the proper analytical tools to value a small, closely held corporation with little possibility of going public." Furman v. Commissioner, T.C. Memo. 1998-157, 75 T.C.M. (CCH) 2206, 2214, 1998 T.C.M. (RIA) par. 98,157, at 868-98. Unlike the market contemplated by CAPM, the market for Peoples stock, to the extent one even exists, is not efficient, liquid, or free of significant transaction costs. Moreover, in relation to other closely held corporations, the liquidity of a financial institution is even further reduced by the fact that acquisitions and dispositions of

its stock are subject to regulatory approval.[19]  Finally, CAPM assumes that investors hold, or have the ability to hold, diversified portfolios that eliminate, on a portfolio basis, the effects of unsystematic risk--the elements of risk that are specific to the asset held.  Consequently, because CAPM assumes that an investor holding a diversified portfolio will encounter only systematic risk, the only type of risk for which an investor can be compensated is systematic or market risk, which represents the sensitivity of the future returns from a given asset to the movements of the market as a whole.  See id. (citing Brealey & Myers, Principles of Corporate Finance 137-138, 143-144 (4th ed. 1991); Pratt et al., Valuing a Business 166 (3d ed. 1996)).

In calculating Peoples' discount rate, Mr. Fuller followed the principles of CAPM and did not make any provision for Peoples' unsystematic risk, based on the assumption that such risk was diversifiable.  Yet respondent and Mr. Fuller have overlooked the difficulties in diversifying an investment in a block of stock they argued is worth approximately $8.94 million. Construction of a diversified portfolio that will eliminate most unsystematic risk requires from 10 to 20 securities of similar value.  See Brealey & Myers, supra at 137-139.  Thus, proper diversification of an investment in the Peoples shares owned by

---

[19] An acquisition of greater than a 24.9-percent interest requires Federal regulatory approval.

petitioner, as valued by respondent, would require a total capital investment of at least $89 million.  We do not think the hypothetical buyer should be limited only to a person or entity that has the means to invest $89 million in Peoples and a portfolio of nine other securities.

As illustrated by Mr. Fuller's valuation, the selection of beta is another problem inherent in the application of CAPM to the valuation of closely held companies.  See Furman v. Commissioner, supra.  Beta, a measure of systematic risk, is a function of the relationship between the return on an individual security and the return on the market as a whole.  See Pratt et al., supra at 166.  The betas of public companies are frequently published or can be calculated using historical pricing data on the company's stock.  Thus, a beta cannot be calculated for the stock in a closely held corporation--it can only be estimated based on the betas of comparable publicly traded companies.  However, because the betas for small corporations tend to be larger than the betas for larger corporations, it may be difficult to find suitable comparables when valuing a small, closely held corporation.  See Ibbotson Associates, Stocks, Bonds, Bills & Inflation, 1993 Yearbook (Ibbotson) at 159; Copeland et al., Valuation: Measuring & Managing the Value of Companies 265-266 (2d ed. 1994).  In this case, Mr. Fuller used 1

as the beta, which equaled the relevered[20] average beta of the banks on the VL bank list. As discussed, supra, there are substantial differences in size and operations between Peoples and the banks on the VL bank list; we do not believe that their betas are representative of the greater business risks faced by Peoples. For example, in comparison to the large banks on the VL list, Peoples had limited opportunities for growth; less ability to diversify risk, because of limited product offerings and dependence on the economic conditions of a few counties; lacked the ability to create the economies of scale available to large banks; had greater interest rate risk because it could not sell mortgages on the secondary market; had less control over credit risk due to inadequate underwriting standards and a lack of information technology support; and could not afford to employ the personnel and technology used by large banks to protect and pursue earnings through the management of interest rate risk.

Mr. Fuller did not otherwise adequately support his selection of a beta of 1, a figure he admits is "approximately equal to the overall market average of 1 based on the S&P 500."[21] That statement, if anything, suggests that Mr. Fuller's beta is

---

[20] Mr. Fuller did not explain why he used the relevered beta, rather than the unlevered beta, when Peoples was not leveraged.

[21] The S&P 500 stock index includes 500 of the largest stocks (by market value) in the United States.

unreasonably low; using a beta greater than 1 would increase the discount rate used in the Fuller analysis, thereby decreasing the value otherwise computed. We do not believe that an investment in Peoples, a small, single-location bank, whose earnings were susceptible to impending interest rate mismatches and sluggish local economic conditions, presents the same systematic risk as an investment in an index fund holding shares in 500 of the largest corporations in the United States.

In calculating the discount rate, Mr. Fuller used an equity risk premium of 7.3 percent, "based on the average share of common stock of publicly traded companies", and cited Ibbotson. We think that Mr. Fuller meant Ibbotson's long-horizon equity risk premium, which represents the total returns of large company stocks, less the long-term risk-free rate, which is widely used in calculating a cost of capital under CAPM.

Although Mr. Fuller cited Ibbotson as his source for equity risk premium, in his initial report he ignored a crucial aspect of the Ibbotson approach to constructing a cost of capital--the small stock premium. In his rebuttal report, Mr. Fuller unsuccessfully tried to persuade us that the small stock premium is not supported by financial theory, characterizing the risk associated with a firm's size as unsystematic risk, for which the market does not compensate. The relationship between firm size and return is well known. Size is not an unsystematic risk factor and cannot be eliminated through diversification. "On

average, small companies have higher returns than large ones."

Ibbotson at 125 (citing Banz, The Relationship Between Returns

and Market Value of Common Stock, 9 J. Fin. Econ., 3-18 (1981)).

We have already alluded to the likelihood that small stocks will

have higher betas than larger stocks, because of greater risk.

See Ibbotson at 126.  However, it has been found that the greater

risk of small stocks is not fully reflected by CAPM, in that

actual returns may exceed those expected based on beta.  See id.

Consequently, when calculating a cost of capital under CAPM on a

small stock[22], it is appropriate to add a small stock premium to

the equity risk premium, to reflect the greater risk associated

with an investment in a small stock in comparison to the large

stocks from which the equity-risk premium is calculated.  Based

on Peoples' size, a microcapitalization equity size premium of

3.6 percent should have been added.  See Ibbotson at 161.

Consequently, even if we accepted Mr. Fuller's beta of 1, which

we do not, Peoples' cost of capital should have been at least 18

percent.

     b.   Guideline Company Method

The market approach used by Mr. Fuller was the guideline

company method (guideline method).  Under the guideline method,

---

[22] There are actually three different premiums: (1) The mid-capitalization equity size premium (capitalization between $696 and $3,015 million); the low-capitalization equity size premium ($171 million to $696 million); and (3) the microcapitalization equity size premium (capitalization below $171 million).

value measures are developed using the stock prices of similar

companies (guideline companies) that are publicly traded.  The

value measures are then compared to the subject company's

fundamental data to reach an estimate of value for the subject

company or its shares.  Because value under the guideline method

is developed from the market data of similar companies, the

selection of appropriate comparable companies is of paramount

importance.

Mr. Fuller's principal criterion for selecting guideline

companies was geography, rather than size, financial, or

operating characteristics.  All seven of the guideline companies

selected operated primarily in Indiana, Illinois, and Ohio.

As in the DCF analysis, Mr. Fuller adjusted the values of

Peoples' equity and assets to adjust the book equity-to-assets

ratio to 9 percent and made an adjustment to earnings.  Mr.

Fuller then calculated the median price-to-earnings[23] multiple

(10.4), price-to-assets ratio (12.1 percent), and price-to-book

equity ratios of the guideline companies (110.3 percent).  After

calculating a value from operations using the ratios, Mr. Fuller

added back the excess equity value, reduced by a 10-percent

minority discount, to find the total value of Peoples' equity.

Applying the ratios to the adjusted equity, assets, and earnings

---

[23]  The price-to-earnings multiple used by Mr. Fuller was
based on the most recent four quarters' earnings for each
corporation.

figures of Peoples, Mr. Fuller determined the following total
equity values:

| Ratio | Total Value |
|-------|-------------|
| Price-to-earnings | $24,751,000 |
| Price-to-book equity | 19,344,000 |
| Price-to-assets | 21,021,000 |

Mr. Fuller then used the mean of the values determined using the
price-to-book equity and price-to-assets ratios to determine a
total equity value of $20,200,000.  He did not include the value
determined using the price-to-earnings ratio, as he thought the
"unusually high earnings reported for the period may result in
the value of Peoples being overstated."  Finally, Mr. Fuller
applied a 10-percent marketability discount.

Mr. Fuller supported his finding of a 10-percent
marketability discount in his discussion of both marketability
and control premium factors.  He concluded that little or no
marketability discount was appropriate, because the estate shares
carried significant elements of control and might command a
control premium.  Mr. Fuller failed to focus on the fact that two
conceptually distinct adjustments were involved, one a discount
for lack of marketability and the other a premium for the
benefits of control.  See Estate of Andrews v. Commissioner, 79
T.C. 938, 952-953 (1982).  Although there may be some overlap,
because control, or lack of it, is a factor that may affect
marketability, even controlling shares in a nonpublic corporation

can suffer from lack of marketability, because of the absence of a ready private placement market and the costs of floating a public offering.  See id. at 953.

We agree with Mr. Fuller's use of the guideline method and his adjustments to reflect excess capital; however, we do not think that his selection of guideline companies was appropriate, in light of Peoples' thriftlike operations and earnings base. Five of the seven guideline companies selected by Mr. Fuller were bank holding companies engaged in a broad range of personal and commercial banking services.  Only two of the guideline companies chosen were thrifts, and like most of the other guideline companies, they were multibranch institutions that had significantly greater assets than Peoples, though not by the same order of magnitude as the banks on the VL bank list.  On its December 31, 1992, balance sheet, Peoples reported total assets of $90.6 million; in comparison, the mean and median total asset values of the guideline companies were $303.1 million and $323.3 million, respectively, for the comparable period.[24]

2.  Petitioner's Expert

Petitioner relies on the expert report of James E. Magee, a director and senior associate of Alex Sheshunoff & Co. Investment Banking (ASC).  Headquartered in Austin, Texas, ASC is nationally

---

[24] Mr. Fuller provided asset values for six of the guideline companies as of Dec. 31, 1992, and for the seventh as of Dec. 31, 1993.

known for its valuation and mergers and acquisitions expertise in the financial services industry and has been recognized as an expert by Federal banking regulators, including FDIC, Federal Reserve Bank (FRB), Office of the Comptroller of the Currency (O.C.), and OTS.  ASC has completed over 300 merger and acquisition transactions and over 3,500 stock valuations involving regional and community banks and thrifts.

Mr. Magee has over 30 years of experience in the banking industry.  In the first half of his career, Mr. Magee worked in management positions at two New York banks, including one money center bank where he was a vice president, and as a regulator employed by the board of Governors of the Federal Reserve System, Division of Supervision and Regulation.  The latter half of Mr. Magee's career has been spent as an appraiser and consultant serving the banking industry exclusively.  Mr. Magee holds an M.B.A. in finance from Adelphi University in New York.

Using the guideline method, Mr. Magee valued the estate shares at $4,497,000 ($3,000 per share).  While employing the same general approach as Mr. Fuller, there are a number of differences in Mr. Magee's report that account for their substantial differences of opinion regarding the fair market value of the estate shares.

Mr. Magee's methodology for selecting guideline companies was significantly more exacting than Mr. Fuller's.  As discussed supra, Mr. Fuller's guideline companies included five banks and two thrifts, most of which were significantly larger than Peoples.  In contrast, Mr. Magee's selection criteria were

limited to thrifts comparable in size to Peoples. The emphasis on thrifts, rather than banks, is in accordance with our finding that Peoples, while legally chartered as a bank, more closely resembled a thrift in its operations.

As discussed supra, the guideline company data used by Mr. Fuller was based on publicly traded minority interests; Mr. Magee, in contrast, used two groups of guideline companies, one based on mergers and acquisitions of private companies, the other based on publicly traded minority interests like that used by Mr. Fuller. Mr. Magee looked at both minority and control transactions because he conceded that the estate shares had effective control.

To examine thrift pricing on a control basis, Mr. Magee selected six thrifts (the control group) meeting the following criteria: (1) Thrifts that sold in the Midwest, (2) return on average assets greater than 1 percent, (3) total assets less than $100 million, and (4) transactions that were pending or completed between January 1 and December 31, 1992. In order to examine thrift pricing on a minority basis, Mr. Magee selected 10 thrifts (the minority group) meeting the following criteria: (1) Thrift organizations in the United States, (2) total assets less than $150 million, (3) not subject to announced or rumored acquisition, and (4) publicly traded securities as evidenced by listing on a major exchange [or trading market].

3. Comparison of the Experts' Reports

In performing their analyses under the guideline method, Messrs. Fuller and Magee both focused on the same three ratios:

(1) Price-to-earnings, (2) price-to-book equity, and (3) price-to-assets. However, they disagreed to some extent on the weight to be accorded each of the three ratios. As discussed supra, Mr. Fuller used an equal weighting of the values derived using the price-to-book and price-to-assets ratios, while rejecting the use of the price-to-earnings ratio over concerns that it would overstate value. Mr. Magee used an equal weighting of the values found using the price-to-earnings multiple and the price-to-book ratio. Mr. Magee did not use the price-to-assets ratio in reaching his valuation conclusion and described it as a "check point" for the other two ratios, rather than as the "principal determinant of the value of a controlling interest." However, Mr. Magee noted, the price-to-assets ratio does provide "additional stability" to the analysis by removing the effects of variability in earnings and book equity.

We agree with Mr. Fuller that the use of the price-to-earnings ratio may overstate the value of the estate shares, due to the fact that a large portion of Peoples earnings was attributable to investments in high yielding Treasury securities. We also think the weighted average of the price-to-book and price-to-asset ratios will be more likely to cancel out any anomaly in the data for either ratio. Accordingly, in valuing the estate shares under the guideline method, we look to the price-to-book and price-to-asset ratios.

The mean, median, high, and low values for the guideline companies examined by Messrs. Fuller and Magee are as follows:

### Guideline method ratios

|        |        | Price/earnings multiple | Price/book ratio | Price/assets ratio |
|--------|--------|-------------------------|------------------|--------------------|
| Fuller |        |                         |                  |                    |
|        | Mean   | 11.20                   | 120.50%          | 11.90%             |
|        | Median | 10.40                   | 110.30           | 12.10              |
|        | High   | 15.40                   | 171.50           | 16.30              |
|        | Low    | 6.70                    | 72.10            | 6.40               |
| Magee  |        |                         |                  |                    |
| Control |       |                         |                  |                    |
|        | Mean   | 9.16                    | 124.14           | 10.38              |
|        | Median | 8.64                    | 124.87           | 9.95               |
|        | High   | 16.40                   | 167.76           | 15.00              |
|        | Low    | 2.74                    | 76.19            | 5.41               |
| Minority |      |                         |                  |                    |
|        | Mean   | 6.42                    | 54.73            | n/a                |
|        | Median | 6.45                    | 52.74            | 18.52              |
|        | High   | 6.47                    | 82.05            | 37.60              |
|        | Low    | 6.35                    | 32.38            | 9.50               |

Based on the data of their respective guideline companies, Messrs. Fuller and Magee chose the following ratios to value the estate shares:

### Guideline method ratios used in valuing the estate shares

|        | Price/earnings | Price/book | Price/assets |
|--------|----------------|------------|--------------|
| Fuller | 14.13*         | 153.7%     | 12.3%        |
| Magee  | 5.5            | 65.0%      | not used     |

* Calculated, but not used in actual valuation

Differences in perception are common in questions of valuation. The differing ratios chosen by Messrs. Fuller and Magee to value the estate shares reveal an extreme divergence of views. All three ratios used by Mr. Fuller exceed the respective

mean and median of the guideline companies; both the price-to-earnings multiple (used but ultimately ruled out) and the price-to-book equity ratio are near the highest values in the guideline company data. In contrast, the price-to-earnings multiple and price-to-book ratios selected by Mr. Magee are comparable to the mean values from the minority group data.

While there is little difference in Mr. Fuller's guideline company data, and Mr. Magee's control group data, we think that Mr. Magee's criteria for the selection of comparable companies produced a group of companies that more closely resembled the size and operating characteristics of Peoples than Mr. Fuller's guideline companies. Accordingly, in determining the value of the estate shares under the guideline method, we rely on the data supplied by Mr. Magee.

Mr. Magee did not, however, address Peoples' overcapitalization and, unlike Mr. Fuller, did not make any normalizing adjustments. In contrast, as discussed supra, Mr. Fuller removed excess equity, valued equity from operations, and then added back the excess equity. Adjustments to equity were necessary to value Peoples properly, and we think Mr. Fuller used a sensible approach in so doing. Accordingly, in valuing the estate shares, we use adjusted equity and assets of $6,999,000 and $77,770,000, respectively, for purposes of the guideline method, and $12,919,000 in excess equity before discounts.

We also differ with Mr. Magee on his use of ratios that more closely resemble the minority group data than the control group data. Inasmuch as the estate shares had effective control, we think that they should be valued as a controlling, rather than minority, interest. Accordingly, we value the estate shares using the control group data.

We disagree with Mr. Fuller's optimistic assessment of Peoples' standing among comparable institutions (or the less-than-comparable institutions he used). Had we not removed the excess equity in performing the guideline method, then perhaps Peoples would be more attractive than its financials would otherwise suggest, due solely to the value of excess equity, which could be paid out as an extraordinary dividend. However, when using the guideline method to value Peoples' equity from operations (and adding back the excess capital), we think that the attractiveness of Peoples, and of the estate shares, takes a dramatic nosedive.

As an institution, Peoples was financially sound, but offered an investor little hope of meaningful growth in revenues or earnings. A number of negative factors have been discussed supra, such as a limited market, limited product offerings, aggressive competitors, and outdated technology. Peoples was also hindered by its employees, who on average were at least in their midfifties, and tended to resist change. In sum, we think that Peoples showed little potential to be much more than what it

was on the valuation date; we therefore think it appropriate to value Peoples as an enterprise at the low end of the control group. Accordingly, for purposes of valuing the estate shares, we use a price-to-book ratio of 77 percent and price-to-assets ratio of 5.5 percent. Based on adjusted shareholder equity of $6,999,000 ($2,333 per share) and adjusted assets of $77,770,000 ($25,923 per share), we find a value of equity used in operations of $5,389,230 ($1,796.41 per share) using the price-to-book ratio, and $4,277,350 ($1,425.78 per share) using the price-to-assets ratio. Averaging the two ratios, we find a value of equity from operations of $4,833,290 ($1,611.10 per share). We agree with Mr. Fuller's application of a 10-percent minority discount to the excess equity, and, accordingly, add $11,627,100 ($3,875.70 per share) of excess equity from nonoperating assets to the value of equity from operations, producing a fair market value of total equity of $16,460,390 ($5,486.80 per share). Accordingly, we hold that the fair market value of 1,499 shares of Peoples stock, before consideration of marketability concerns, is $8,224,713.[25]

Mr. Magee distinguished the estate shares from the shares of publicly traded companies due to their lack of marketability in support of his application of a 30-percent marketability discount. Mr. Magee cited several empirical studies that, on

---

[25] $5,486.80 x 1,499 = $8,224,713

average, support the application of marketability discounts in the range of 30 to 45 percent.  Mr. Magee analyzed several factors with respect to the marketability of the estate shares, such as earnings quality, dividend payment history, size of the block of stock, prices of comparable investment substitutes, management's stock redemption policies, capitalization of the firm, and economic factors.  In his analysis he noted certain factors in support of a discount, including Peoples' interest rate risk, the sewer tap ban, and the modest economic growth in Peoples' market area.  Mr. Fuller also emphasized the lack of liquidity in Peoples stock, which was not subject to any repurchase or employee stock option plan and was not easily sold, as evidenced by the fact that a block of 100 shares had been offered and available for sale for more than 5 years without eliciting any expressions of interest.

While we recognize that elements of control may enhance marketability, we do not think that the estate shares were rendered marketable by virtue of their effective control. No matter who was in control, Peoples was still a small, community bank with limited growth opportunities, capitalized with common stock that was not publicly traded and not easily sold privately.  A buyer of the estate shares would either have to sell the block privately, cause Peoples to make a public offering, or seek an acquiror.  Any of those three options could take a number of months, and require significant transaction

costs for the services of accountants, lawyers, and investment bankers.

Accordingly, although we recognize the estate shares' effective control in valuing Peoples equity from operations, we do not think that a 49.97-percent interest in a small, closely held bank, is a readily marketable interest.  Accordingly, we apply a 30-percent marketability discount to the fair market value of the estate shares, and hold that on the valuation date, the estate shares had a fair market value of $5,757,296 ($3,840.76 per share).

To give effect to the concessions of the parties and our determination of the fair market value of the estate shares,

Decision will be entered

under Rule 155.